GALBREATH et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. December 8, 1918.)

No. 3130.

1. BANKS AND BANKING ⬤⟿257(3)—OFFENSES.

In a prosecution against the president of a national banking association and his successor, under Rev. St. § 5209 (Comp. St. § 9772), for directing false entries in the books with intent to deceive and for misapplication of funds, evidence *held* sufficient to sustain a conviction.

2. BANKS AND BANKING ⬤⟿256(1, 3)—OFFENSES—INTENT.

In a prosecution, under Rev. St. § 5209 (Comp. St. § 9772), against the president and another officer of a national banking association for misapplication of funds and for directing false entries in the books, a showing that the false entries were made with intent to deceive, and that the misapplications were made to injure or defraud bank, is essential to conviction.

3. BANKS AND BANKING ⬤⟿257(4)—NATIONAL BANKING ASSOCIATION—OFFENSES.

In a prosecution, under Rev. St. § 5209 (Comp. St. § 9772), against the president and another officer of a bank for making false entries in the books and misapplying funds, evidence *held* sufficient to carry to the jury the question whether the entries were made with intent to deceive and the misapplications with intent to injure or defraud the bank.

4. BANKS AND BANKING ⬤⟿256(3)—NATIONAL BANKS—OFFENSES.

An intent to injure or defraud a national banking association by misapplication of funds, which offense is defined by Rev. St. § 5209 (Comp. St. § 9772), is not inconsistent with the desire for the ultimate success and welfare of the bank, and such intent may, within the meaning of the law, result from an unlawful act voluntarily done, the natural tendency of which is to injure the bank.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. CRIMINAL LAW ⬤⟿1144(17)—APPEAL—PRESUMPTIONS—JUDGMENT.**

Where there is one good count in the indictment, and the evidence is sufficient in law to support it, and judgment is such as might have been imposed upon it alone, the presumption is that it was imposed upon the good count, supported by evidence, and will not be reversed, though there are bad counts, or counts unsupported by evidence.

**6. BANKS AND BANKING ⬤⟿257(3)—NATIONAL BANKS—OFFENSES—EVIDENCE.**

In a prosecution under Rev. St. § 5209 (Comp. St. § 9772), against the president and another officer of the national bank for misapplying funds and making false entries in the books, which practices occurred in connection with loans and advances to a company in which those officers were interested, the admission in evidence of parts of the record in bankruptcy proceedings of such company, showing it was adjudicated a bankrupt on admission in writing that it was entirely insolvent, and that dividends of only 10 per cent. were paid, was proper, though the last transaction charged in the indictment occurred six months before the bankruptcy.

**7. CRIMINAL LAW ⬤⟿369(1)—EVIDENCE OF OTHER OFFENSES—REMOTENESS.**

In a prosecution under Rev. St. § 5209 (Comp. St. § 9772), against the president and another officer of a bank for misapplying its funds and making false entries in the books in connection with loans and advances to a company which became insolvent, evidence of similar transactions occurring two or three years before those set forth in the indictment is admissible, over the objection of remoteness.

**8. CRIMINAL LAW ⬤⟿1153(6)—REVIEW—EVIDENCE—SECONDARY EVIDENCE.**

The sufficiency of proof of loss of records to warrant the admission of secondary evidence of their contents is primarily addressed to the trial judge, whose findings should not be disturbed, unless plainly wrong.

**9. CRIMINAL LAW ⬤⟿402(1)—SECONDARY EVIDENCE—LOSS OF BOOKS.**

In a prosecution against the president and another officer of a bank for misapplication of funds and the making of false entries in the books in connection with loans and advances to a corporation which became bankrupt, testimony by an expert accountant, who had examined the books and records of the company which became a bankrupt, and had made summaries thereof, *held* admissible on proof of loss of such books and records.

**10. CRIMINAL LAW ⬤⟿1169(5)—HARMLESS ERROR—EVIDENCE—INSTRUCTIONS.**

In a prosecution against the president and director of a bank for making false entries and misapplication of funds in connection with loans to a company which became bankrupt, the admission of evidence of the contents of books and records of such bankrupt was not error, where the court charged there was no presumption that defendants knew the contents of such books, and that the evidence could be considered only to the extent it was shown defendants did have knowledge of the contents.

**11. CRIMINAL LAW ⬤⟿400(8)—EVIDENCE—SECONDARY EVIDENCE.**

In a prosecution against officers of a national bank, who were charged with making false entries, etc., an expert accountant may testify as to summaries which he made of the contents of such books, in connection with loans to a company which became bankrupt and whose books were lost; the fact that the accountant reversed certain items in making his summary not rendering the testimony inadmissible, where the changes were explained to him by the jury.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; John E. Sater, Judge.

Elmer E. Galbreath and Charles H. Davis were convicted of violating Rev. St. § 5209 (Comp. St. § 9772), declaring that every president, director, and cashier of any national banking association, who

embezzles, abstracts, or misapplies any moneys, or makes any false entries in any book, etc., shall be punished, and they bring error. Affirmed.

Walter M. Shohl, Froome Morris, and Miller Outcalt, all of Cincinnati, Ohio, for plaintiffs in error.

Edward K. Bruce, Asst. U. S. Atty., of Cincinnati, Ohio.

Before KNAPPEN and DENISON, Circuit Judges, and WESTENHAVER, District Judge.

WESTENHAVER, District Judge. Plaintiffs in error, referred to herein for convenience as defendants, were jointly indicted April 10, 1913, for alleged violation of section 5209, Revised Statutes of the United States (Comp. St. § 9772), the material parts of which section are copied in the margin.[1] The indictment contains 28 counts, and a general verdict of guilty was rendered upon all of them, and each defendant sentenced to imprisonment for a term of 7½ years. This proceeding is to reverse that judgment.

The transactions upon which the several counts of the indictment are based cover a period from October 3, 1910, to December 12, 1911, and consist of 14 different transactions. Each one is made the basis of 2 counts. Davis was president of the Second National Bank of Cincinnati, Ohio (hereinafter referred to as the bank), during the period covered by these transactions until early in 1911, after which he was chairman of its board of directors. Galbreath was vice president of the bank and succeeded Davis as president. The transactions in question were in connection with the Ford & Johnson Company, sometimes hereinafter called the company.

The first 7 counts charge misapplication of certain funds of the bank, and the third 7 counts charge false entry on the books of the bank in connection with the same transaction. They are based on alleged misapplication of funds by use of what are called in the record "transfer checks," and false entry on the books by carrying these checks as currency. The second 7 and the fourth 7 counts are based on overdrafts in the Ford & Johnson Company account; the first group charging that these overdrafts were misapplication of funds, and the last group that they were abstraction of funds.

The misapplication counts, 1 to 7, inclusive, are all similar in character, so that a statement of one will do for all. This first count charges that on November 8, 1910, the Ford & Johnson Company presented to the bank and received credit for a check of $30,000 drawn by it on the Cincinnati Trust Company, at which time the Ford & Johnson Com-

[1] Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of the association, * * * or who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association, * * * shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten.

pany had no money to its credit in the trust company, and that said check was not presented by the bank to the trust company for payment, but was held and carried as currency in the bank until December 13, 1910, when it was withdrawn from the bank, having been paid by check drawn by the Ford & Johnson Company on the bank and from a loan made to it by the bank. The remaining counts, 2 to 7, inclusive, are of the same general character, involving checks drawn at intervals between December 13, 1910, and November 24, 1911, for amounts ranging from $2,000 to $7,500, and being similarly held without presentation for payment for from 1 to 3 months.

The third group of 7 counts, 15 to 21, inclusive, charge that these 7 different checks were carried on a book of the bank, known as the "Receiving Teller's Cash Book," as currency during the time they were so withheld from presentation for payment, and that, therefore, false entries were thereby made in a book of the bank with intent to deceive the National Bank Examiner. As to the remaining counts based on misapplication and abstraction by means of overdraft, we deem any specific statement unnecessary.

[1] The errors assigned are that a verdict of not guilty should have been directed as to both defendants, and the judgment should therefore be reversed, because the evidence was not sufficient to sustain a conviction as to any of them, that the court erred in one respect in its charge, and that it erred by the admission of sundry items of evidence. The error mainly urged and relied on is that the verdict is without sufficient evidence to support it. Defendants' contention is that the evidence does not connect either of the defendants with any of these transactions, and that there is no evidence of any intent to injure or defraud the bank. This contention calls for an examination of the evidence, and this we have done with care. In our opinion there was sufficient evidence to go to the jury, and to sustain a conviction as against both defendants. A brief review of the outstanding facts will show the reasons for our conclusion.

Defendants' counsel, as we understand, do not assert that these transactions, if they occurred as alleged, were not misapplication of the funds of the bank, and were not false entries. The contention is that the several witnesses who testified thereto left it uncertain as to who authorized and directed the misapplication and the false entries, and that upon the familiar rule that, where the evidence shows a crime to have been committed by one or the other of two defendants, but does not show which, a verdict of guilty is not sustained as against either. The evidence here does not seem to us to be of that indefinite nature.

Davis, as has been already stated, was president of the bank until early in 1911; he then became chairman of the board of directors at a reduced salary. Galbreath was vice president, and succeeded Davis in the presidency. These two persons were, during all the time under investigation, in the active management and control of the bank's business; they were its executive heads and managers. The cashier, assistant cashier, receiving teller and the vice president all testified in the case. They testified that all these transfer checks, and the false entry thereof on the receiving teller's book as cash, were authorized and di-

rected by one or the other of the two defendants. No witness was able to say as to any one transaction that it was directed by Davis or by Galbreath, but all say that the directions were given by one or the other; that all were handled and directed from the front office—that is, the president's room, which was occupied by Davis, while he was president, and adjacent to which was the desk of Galbreath; that no other officer or person connected with the bank either claimed or exercised any authority or direction in connection therewith; that whichever one was present or accessible whenever a transaction of this kind had to be passed on did so; that the practice of handling and directing these transactions by one or the other of the defendants was so well known that all minor bank officers or employés went direct to them, and not to their immediate superior.

The representative of the Ford & Johnson Company, namely, George V. Cutter, its secretary, when necessity arose for a favor of this kind from the bank, would apply direct either to one or the other of the defendants, and the transfer check, with proper deposit slip and directions to carry as cash, would be transmitted to the bookkeeper and receiving teller from the front office. There was testimony that the cashier would be called to the president's office, sometimes Davis would be there, sometimes Galbreath, sometimes both of them, and he might not know what the conversation had been, or what the arrangements were, but one or the other would hand him a transfer check, tell him to make out a deposit ticket, deposit it to the credit of the Ford & Johnson Company, and have the receiving teller hold it as cash. The answers of the witness so testifying, and of others, that he was unable to remember whether it was Davis or Galbreath who handled each or any specific transaction, does not limit or qualify this evidence. The jury was warranted in inferring that at least some of these transactions were handled jointly by the defendants in the manner described.

The learned trial judge in his charge, however, gave defendants the full benefit of the law as they contend it is, and in effect directed a verdict of acquittal as to the transfer check and false entry counts, unless the jury found that there was a plan or agreement between the two defendants that these several transactions should be handled in this way. There was, in our opinion, sufficient evidence to warrant a finding that there existed a general plan or system, to which both defendants were parties, to use the bank's funds in this way by transfer checks for the benefit of the Ford & Johnson Company.

Both defendants during all the time in question were large stockholders in the Ford & Johnson Company. Davis was a director of the company as early as 1907, and its vice president, drawing a salary of $4,000 a year from 1908 until as late as September, 1910, if not later. Galbreath was its treasurer downward from 1908 to March, 1910, and drew a salary of $3,000 a year. The evidence tends to show that both were active in its financial management; Galbreath especially was fully informed concerning its affairs, so much so that, after he ceased to be treasurer, one of the experts examining into its affairs says he could always get information from him about any matter as to which all other persons seemed to be unfamiliar.

In the fall of 1909, and perhaps earlier, the Ford & Johnson Company was in serious financial difficulties. It was unable at times to meet its pay rolls; its account at the bank was frequently, if not continuously, overdrawn in large amounts; the needs of its daily business were financed from "hand to mouth" with the assistance of the bank; it was losing money on the business done, and was getting deeper into debt. The evidence tends to show familiar knowledge of these difficulties by both defendants. Furthermore, between July, 1908, and October 1, 1909, the Ford & Johnson Company engaged in a series of transactions of more than doubtful propriety, with which both defendants must have been familiar, and which have an important relation to the transactions under consideration.

The company created a number of subsidiary companies, transferred to each of them some of its assets, taking in exchange therefor capital stock of the subsidiary companies. This capital stock had no value behind it, except the assets transferred from the parent to the subsidiary companies, and the valuation placed thereon for the purpose of issuing stock was approximately $1,250,000 in excess of the book value of these assets. This capital stock was made the basis for an issue of what is called gold trust notes; that is, the Ford & Johnson Company issued gold trust notes in the sum of $1,000,000, payable in 1919, pledging this capital stock alone as security therefor. These notes, although carried in the statements of the company as outstanding obligations for which value had been received, payable in 10 years, were never in fact sold, but were pledged as security for demand or short time paper. A part of the large indebtedness of the Ford & Johnson Company to the bank had no other security back of it, except these gold trust notes.

The extent of the indebtedness of the company to the bank, in addition to the transfer check transactions, is not definitely shown, but was admittedly large, and in excess of the amount permissible under the law to be made to any one customer. The Comptroller of the Currency and the national bank examiner during this period complained frequently of this indebtedness, called attention to these excessive loans, and stated that there was serious danger of loss. This correspondence need not be summarized, but the evidence shows that it came to the attention of both defendants, and that they joined in representing that the company's affairs were in good shape and that it was reducing its obligations. Both assumed to have knowledge of the financial condition of the company.

Many transactions similar to those described in the first to the seventh counts are shown to have taken place. They began as early as the fall of 1909, and continued thenceforward to and during the period covered by the indictment. They were all handled, authorized, and entered in the same way. Ordinary overdrafts were passed on by the cashier, but overdrafts and transfer checks of this company were handled and passed on only by one or the other of the defendants. These transactions were not brought to the attention of the board of directors. So far as the evidence shows, the board of directors was informed only once, and that on August 26, 1910, that the company's account was overdrawn. A loan of $25,000 on the security of assigned accounts re-

ceivable was then authorized, on condition only that an overdraft for $64,000 be similarly secured. Davis and Galbreath were both present at this meeting.

This is by no means all the evidence tending to show a plan or system, and the joint participation of the defendants therein, of using the bank's funds in this manner for the benefit of the Ford & Johnson Company. On the whole testimony, we are of opinion that the court below was warranted in submitting the case to the jury, and that the jury was warranted in finding that defendants jointly participated in all these transactions.

[2, 3] The criminal intent with which these acts must have been done, in order to warrant a verdict of guilty, differs as to the false entry counts from the misapplication counts. As to the former, the intent required to be proved is that the false entries were made with intent to deceive any officer of the association, or any agent appointed to examine its affairs, while, as to the misapplication counts, the intent, to be criminal, must have been to injure or defraud the bank. Defendants' counsel, although urging that the evidence is insufficient to show a criminal intent, seem to limit their argument to a lack of evidence to show any intent to injure or defraud the bank. An intent to deceive by these false entries is plainly inferable from the facts proved. The evidence shows that the receiving teller's cash book is a book of the bank, that in due course of business there is entered therein the cash on hand, distributed under headings, gold, silver, currency, and cash items; that to carry these transfer checks as cash required them to be entered either as gold, or silver, or currency, and not as a cash item. The only correct entry of these checks would have been to have included them among cash items, in which event the full nature of the transaction would have appeared upon the receiving teller's cash book. The necessary or reasonably probable effect of entering them as currency was to deceive any agent or examiner.

This intent to deceive is further evidenced by the fact that no funds to meet these checks were in the Cincinnati Trust Company during the time they were thus carried; also by the fact that in one instance, perhaps more, currency was got from the trust company on a transfer check, and held in preparation for a visit of the bank examiner, and returned later after his departure, and the transfer check taken back and held thereafter as currency until later canceled in the usual manner.

The contention that the evidence is not sufficient to show an intent to injure or defraud is in part covered by the foregoing summary of the evidence. Certain additional contentions with respect thereto are made. It is said Davis was ill for some period not definitely shown prior to August 15, 1910, and that thereafter he passed less time at the president's office, and took a less active part in the conduct of its affairs, and that after retiring from the presidency and becoming chairman of the board of directors early in 1911 he was absent on a trip for his health for a period variously stated as a month, six weeks, or two months. It is also said that an operating committee in September or October, 1910, took charge of the affairs of the Ford & Johnson Company, and that what was done thereafter in the conduct of its business

was done with the approval of this committee, and could not have been done otherwise by the defendants, or either of them, than in entire good faith, and without any intent to injure or defraud. From this premise, and the fact that the transactions described in the indictments occurred after the operating committee took charge, it is argued that the evidence fails to show sufficiently any criminal intent.

The trial judge charged the jury that Davis could not be held for any transaction in his absence and not personally participated in by him, unless they found beyond a reasonable doubt that a general plan or agreement existed between him and Galbreath whereby the acts of one bound the other, even while absent. He also instructed the jury that if the defendants acted honestly and in good faith, for what they believed to be the advantage and protection of the bank, they could not be convicted, although they may have exercised bad judgment in managing and in conducting its affairs, and that mistakes made in good faith and in an honest belief do not constitute a crime. He summarized fully all defendants' contentions, tending to show that they were acting in good faith and without intent to injure or defraud. The charge of the court in this respect is not complained of.

This operating committee, so called, was created in September or October, 1910. Neither Davis nor Galbreath was a member of it. Louis A. Ireton, attorney for the Cincinnati Trust Company, and Charles M. Leslie, attorney for the bank, were members of it. These two members had charge principally of its financial affairs after the committee was constituted. The creation of this committee arose in this wise. In March, 1910, when Galbreath ceased to be treasurer of the company, a man named Powell succeeded him. Powell had become connected with the company on the basis of representations contained in a report of an audit company made up in October, 1909, and on representations as to its condition made by its officers, including Galbreath and Davis. He obtained loans amounting to $200,000 from banks with which he had friendly business relations. He became convinced that the report of the audit company and the representations made to him were incorrect, and procured an audit to be made by an expert accountant. This disclosed that the liabilities were much in excess of what had been represented; that the company's account at the banks was overdrawn $95,000; that the gold trust notes, apparently issued for real money and payable in 1919, had not been sold, but had been pledged on demand or short time paper, and were in fact a current, instead of a deferred, liability. Feeling that he had been imposed upon, and that he had innocently involved friendly banks in the sum of $200,000, he called a meeting of officers of the company, and of the bank, and of the Cincinnati Trust Company, which it seems was involved similarly with the Second National Bank. Davis was not present, but Galbreath was.

All this information, and more, reflecting on the solvency and business methods of the company, was disclosed by Powell at this meeting. It was then agreed that notes would be given for $200,000, to be indorsed by Davis, Galbreath, and others, to take up the loans which Powell had procured, and he thereupon severed his connection with

the company. Davis signed these notes, and the evidence tends to show that he was present at a meeting of the directors of the company on August 15, 1910, and at the bank on August 26, 1910, and regularly thereafter. Everybody concerned, subsequent to the date of this meeting, seemed to have known that the Ford & Johnson Company was on the verge of insolvency and collapse. The general understanding was that if its affairs were well managed it might pay creditors dollar for dollar, but stockholders would get nothing. Leslie and Ireton concerned themselves with its financial operation. They saw that the money received was applied in payment of bills, determining which ones should be paid. The evidence does not show that they knew anything of the transfer check transactions which had been indulged in between the company and the bank previously, or at any time while they were serving on the committee; in fact, the evidence tends to show that they did not. George V. Cutter, secretary of the company, who prior thereto had conducted these transactions with the defendants, continued to do so thereafter. No transfer check issued and credit taken on the books of the bank and falsely held as currency was ever authorized as a result of any request or with the knowledge of the committee, or any member of it. The defendants alone were responsible, so far as the evidence shows, at all times therefor.

[4] It was for the jury to say whether or not an intent to injure or defraud was shown or repelled by these extenuating circumstances. An intent to injure or defraud, as contemplated by the statute, is not inconsistent with a desire for the ultimate success and welfare of the bank. It may, within the meaning of the law, result from an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank. A wrongful misapplication of funds, even if made in the hope or belief that the bank's welfare would ultimately be promoted, is none the less a violation of the statute, if the necessary effect is or may be to injure or defraud the bank. Such is the well-settled law. United States v. Harper (C. C.) 33 Fed. 471; United States v. Kenney (C. C.) 90 Fed. 257; United States v. Breese (D. C.) 131 Fed. 922, 923.

The bank had become heavily involved as a result of previous irregular acts in which the defendants had participated. They had involved themselves with the Comptroller and bank examiner by representations and statements concerning the bank's loans to the Ford & Johnson Company and the condition of its business. They may have thought that, if the plan and method of misapplying funds by transfer checks and falsely entering these checks as cash were ended, the Ford & Johnson Company would go to the wall, dragging down the bank with it, and bringing upon themselves as stockholders in both, and as responsible agents of the bank, loss and censure. In any event, whether or not a criminal intent existed was properly submitted to the jury, under a charge fair to the defendants, and its verdict should not be disturbed.

[5] In view of the conclusion thus reached respecting the transfer check and false entry counts, we deem unnecessary a consideration of defendants' contentions respecting the overdraft and abstraction

counts. The sentence was general, and such as might have been imposed for a conviction on any count. The law is settled that if there is one good count, and evidence sufficient in law to support it, and the judgment such as might have been imposed upon it alone, the presumption is that it was imposed upon the good count, supported by evidence, and will not be reversed, even if there are bad counts, or counts not supported by the evidence. If we were of opinion that these counts were not supported by the evidence, we would feel that this rule should be applied, and an examination, therefore, of the evidence is unnecessary, and will not be made. Claassen v. United States, 142 U. S. 140, 12 Sup. Ct. 169, 35 L. Ed. 966; Hardesty v. United States (C. C. A. 6) 168 Fed. 25, 93 C. C. A. 417; Bartholomew v. United States (C. C. A. 6) 177 Fed. 902, 101 C. C. A. 182; Bennett v. United States (C. C. A. 6) 194 Fed. 630, 114 C. C. A. 402.

One error assigned and urged in the brief is that the court failed to charge, as specially requested, that the law presumes the character of the defendants to be good and that such presumption is evidence in their favor. On the hearing this assignment was withdrawn; counsel admitting that Mullen v. United States (C. C. A. 6) 106 Fed. 892, 46 C. C. A. 22, which was cited in support of it, is not to be taken as the law, in view of Greer v. United States, 245 U. S. 559, 38 Sup. Ct. 209, 62 L. Ed. 469.

[6] Error is assigned to the admission in evidence of certain parts of the record in the bankruptcy proceedings of the Ford & Johnson Company. In April, 1912, this company was adjudged a bankrupt upon an admission in writing by resolution of its board of directors that it was absolutely insolvent and unable to pay its debts. This admission in writing, its schedule of liabilities showing its indebtedness to the bank, and the order showing the payment of a dividend only of 10 per cent. were thus admitted over objection and exception. It is urged that, inasmuch as six months had elapsed from the last transaction charged in the indictment, that changes were shown to have taken place in the assets of the company, and that in any event the amount realized by a bankruptcy sale of assets is no fair test of value, these items were irrelevant, and the admission thereof was prejudicial to the defendants. The date and fact of bankruptcy, and the percentage distributed on debts, however, had already appeared in the testimony without objection or exception. Evidence had also been given showing the financial condition of the company, and the changes in its assets, and their value from year to year, both during, before, and after the period covered by the transactions described in the indictment.

The trial judge told the jury that the guilt or innocence of the defendants was to be determined upon a consideration of the facts and circumstances as they existed at the times mentioned in the indictment; that they must not answer that question by looking back in the light of their present knowledge, but that they must transport themselves to the dates specified, and consider the position of the defendants as it then was, and the situation, facts, and circumstances then existing, and which were then known to them. They were also

257 F.—42

told that the amounts realized from a bankruptcy sale of assets were not to be taken as any evidence of the value thereof at the time of sale, or any prior time. They were also charged that the bankruptcy proceedings, on account of the difference in time, should be entirely disregarded as to the transfer check and false entry counts. In our opinion, in view of these considerations, the admission of this evidence does not constitute prejudicial error, even if immaterial and irrelevant.

[7] Error is also assigned to the admission in evidence of similar transactions. It is said that some of them thus admitted were too remote, and that others were not similar. The other transactions admitted in evidence were similar. The transfer checks were issued by the company, held without presentation for payment, and entered on the receiving teller's cash book as currency, in precisely the same manner as those under consideration. The only difference in any of them is that some of the transfer checks were drawn on a different bank. The evidence tends to show that from October, 1909, with great frequency, down to and including the period covered by the indictment, such transactions took place. In our opinion, none of these transactions were too remote, and all were admissible in evidence in accordance with well-settled rules. 12 Cyc. 411; Jones on Evidence, § 142; Griggs v. United States (C. C. A. 9) 158 Fed. 572, 85 C. C. A. 596; Hardesty v. United States (C. C. A. 6) 168 Fed. 25, 93 C. C. A. 417; Prettyman v. United States (C. C. A. 6) 180 Fed. 30, 103 C. C. A. 304; Hoss v. United States (C. C. A. 8) 232 Fed. 328, 146 C. C. A. 376; Shea v. United States (C. C. A. 6) 236 Fed. 97, 149 C. C. A. 307, and cases therein cited.

[8, 9] Error is also assigned to the admission in evidence of certain testimony given by one Walter Lewis, an expert accountant. This witness had examined the books and records of the Ford & Johnson Company in 1912, and had prepared certain summaries and schedules therefrom. One of them was an operative statement of assets and liabilities year by year, beginning July 1, 1905, and continuing to April 30, 1912. The other showed the profit and loss of its operations by fiscal years, beginning June 30, 1905, and ending April 30, 1912. One objection is that the books and records were not produced in court or made accessible to the defendants. Many witnesses were called to prove the loss of these books and records. The sufficiency of this evidence, so as to dispense with the necessity for their production, is addressed primarily to the trial judge. His finding should not be disturbed, unless plainly wrong (Jones on Ev. § 214), and, in our opinion, his finding is not only not wrong, but is fully sustained by the evidence. Conceding that the proper rule requires that books and records should be produced, or at least made accessible to the opposing parties, in order to render admissible this class of the testimony, it is none the less true that when such books are lost, or are beyond the jurisdiction of the court, the rule applicable to lost documents and the admission of secondary evidence is also applicable in that situation. Wigmore on Evidence, § 1230; Burton v. Driggs, 20 Wall. 125, 135, 136, 22 L. Ed. 299; Jones on Evidence, §§ 211, 217.

[10] Another objection is that the defendants were not shown to be

familiar with the contents of these books and records. The financial condition of the company and whether it was making or losing money were relevant matters of inquiry. The trial judge told the jury that there was no presumption that either defendant knew the contents of these books and records, and that such contents were to be considered only to the extent the evidence tended to show the defendants had knowledge of what was thereby disclosed. In our opinion, the admission of this evidence, taken with these instructions, was not error. Wilson v. United States (C. C. A. 2) 190 Fed. 427, 437, 111 C. C. A. 231; Bettman v. United States (C. C. A. 6) 224 Fed. 819, 831, 832, 140 C. C. A. 265; Sparks v. United States (C. C. A. 6) 241 Fed. 777, 154 C. C. A. 479.

[11] Another objection urged to the admission of this testimony is that the witness, in making up his schedule, reversed certain entries on the books, thereby reducing its assets. The most striking instance of this consisted in shrinking the value of the capital stock received from subsidiary companies in exchange for assets of the parent company to the figure at which these assets had been carried on the company's books. This and other changes made by him were fully explained to the jury, and in view of such explanations, and the instructions of the court, it does not seem to us that any confusion could have been produced in the minds of the jury, nor any prejudice could have resulted therefrom to the defendants.

Finding no prejudicial error in the record, the judgment is affirmed.