**UNITED STATES of America**

v.

**Grier Y. BOEDKER.**

**Crim. No. 74–64.**

United States District Court,
M. D. Pennsylvania.

Nov. 27, 1974.

S. John Cottone, U. S. Atty., Scranton, Pa., for plaintiff.

John R. Lenahan and Joseph A. Murphy, Scranton, Pa., Donald J. Williamson, Burgoyne, Michels, Rose & Williamson, New York City, for defendant.

## MEMORANDUM

NEALON, District Judge.

Defendant, Grier Y. Boedker, former President of the Fidelity National Bank of Pennsylvania, was found guilty by a

jury on 92 counts of willful misapplication of bank funds in violation of 18 U.S.C. § 656,[1] and has moved for a judgment of acquittal or, in the alternative, a new trial. In support of his motion for acquittal, defendant argues that the evidence was insufficient to warrant his conviction and cites several additional grounds in support of his motion for a new trial. In addition, defendant argues that this Court erred in denying his pretrial motion for dismissal of the indictment under the Fifth and Sixth Amendments to the Constitution of the United States and Rule 48(b) of the Federal Rules of Criminal Procedure on the grounds that he had been denied his right to a speedy trial, and that there was unnecessary delay in bringing him to trial.

### JUDGMENT OF ACQUITTAL

■ To sustain a conviction of willful misapplication of bank funds under 18 U.S.C. § 656, it must be proved that (1) the defendant was an officer of (2) a federally connected bank, (3) that he willfully misapplied funds of the bank, and (4) that he made the misapplication with the intent to injure and defraud the bank. United States v. Schmidt, 471 F.2d 385 (3d Cir. 1972) and United States v. Vanetta, 189 F.Supp. 937 (D. Haw.1960). Defendant argues that there was insufficient evidence of the third and fourth elements presented at trial to warrant his conviction.

■ Bearing in mind that, in evaluating a motion for a judgment of acquittal, the "evidence and the inferences to be drawn from it must be taken in the light most favorable to the Government," United States v. Feldman, 425 F.2d 688, 692 (3d Cir. 1970), the facts that could have been found by the jury are as follows:[2] During the time specified in the indictment,[3] June 11, 1971 through July 31, 1971, the defendant was the president of the Fidelity National Bank of Pennsylvania (FNB), a national bank with branches in Danville and Williamsport, Pennsylvania, and was the chief executive officer of the Danville Branch. At the same time, the defendant was also a member of the board of directors and a 10% shareholder of Spread Eagle Farms, Inc. (SEF), a corporation which owned a large farm in Pennsylvania, and which was one of the three largest customers of the Danville Branch of FNB. He was also a member of the finance committee of SEF, where he was kept informed of its financial condition and also participated actively in attempts to obtain financing from certain major corporations, such as Prudential Insurance Company, Heublein, Inc. and Coca Cola, Inc.[4]

During the time specified in the indictment, the Danville Branch of FNB

---

1. The relevant portion of 18 U.S.C. § 656 is as follows:

 "Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank . . . willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both . . . "

2. As neither party has requested a transcript of the trial, none has been filed, and accordingly, my statement of the facts is based on my notes taken during the course of the trial.

3. The indictment on which this case was tried consisted of 109 counts and named two defendants in each count, Boedker and Elwood C. Williard, the president of Spread Eagle Farms, Inc. Counts 1–14 charged false entries in violation of 18 U.S.C. § 1005; count 15 alleged making a false call report in violation of 18 U.S.C. § 1001; counts 16–108 charged willful misapplication in violation of 18 U.S.C. § 656; and count 109 alleged a conspiracy to commit the offenses charged in counts 1–108. At the conclusion of the government's case, all counts as to Williard were dismissed, and as to Boedker, counts 1–15, 108 and 109 were dismissed.

4. Such large-scale investor interest was due to SEF's patenting of a process for freezing eggs shortly after laying. The company had already begun nationwide marketing of the frozen eggs in the form of omelets.

honored 92 checks of SEF, ranging in amount from $17.01 to $27,000 and totaling $477,586, even though at the time the bank honored the checks, SEF had insufficient funds in its account to satisfy the payment demands. SEF never deposited funds with the bank to cover the amount by which its account was overdrawn because of those 92 checks, and as a result, the bank incurred a loss of $477,586.

The checks were honored by the bank under the express instructions of the defendant. The bank's normal procedure for handling checks drawn on an account in which there were insufficient funds to satisfy the payment demand represented by the check (NSF checks) was for the general ledger bookkeeper, after the bank's computer had indicated which checks were NSF checks, to review them, retaining those that could be collected from the account holder and returning the rest to the forwarding bank. FNB's method of handling the NSF checks of SEF was somewhat different. The bookkeeper took those checks to the defendant, who instructed him to keep them and not return them to the forwarding bank, thereby rendering FNB liable to pay the checks.[5] (The defendant had previously informed the president of SEF, Elwood C. Williard, that the bank would honor SEF's checks even though there were insufficient funds in SEF's account.) While it is not uncommon for a bank to retain an NSF check when it is reasonably certain that the amount of the check can be collected from the account-holder, it is not a common practice to retain NSF checks when the account-holder has a history of NSF checks. SEF had a history of NSF checks in its account with the Danville Branch of FNB.

Once the bookkeeper had retained SEF's NSF checks, record keeping became a problem. As the checks were not charged to SEF's account,[6] the bank's records would reflect a discrepancy in the amount of the overdraft checks unless those checks were carried in the bank's books in a manner that did not represent a charge against the bank. At first, the bookkeeper simply resubmitted the checks to the computer in order to balance the bank records; while the checks were "floating" through the computer, they could not be charged against the bank and the records of the bank would balance. This "floating" process would take a full day. Eventually, however, the volume of NSF checks became so large that they were becoming too great a burden to the reconciliation clerk whose job it was to sort out the overdrafts from the computer printouts. The bookkeeper then decided to carry the checks as cash items on the bank's books. A cash item is an item readily convertible into cash; even if it is not so converted for a long period of time (for example as long as six months) it can still be carried as a cash item as long as there is a reasonable belief that it can be collected. Although there was no direct evidence that the defendant specifically instructed the bookkeeper to reconcile the bank's books by either resubmitting the checks to the computer or by carrying them as cash items, the bookkeeper testified that the defendant, with his knowledge of the bank, had to know that, in order to retain these checks and not return them to the forwarding bank, one of these two methods had to be employed in order to balance the records of the bank.

Throughout the period of time specified in the indictment, during which the

---

5. If an NSF check is not returned to the last endorsing bank by "midnight of the banking day of receipt" of the check, the retaining bank becomes liable to pay the check. Regulation J, § 210.12 of the Board of Governors of the Federal Reserve System, 12 C.F.R. 210.12 (1969).

6. At all times during the time specified in the indictment, the statement of SEF's account showed a plus balance and did not reflect the amounts of the checks at issue here.

amount by which the SEF account was overdrawn grew from $27,000 to $477,586, the defendant did not inform the FNB board of directors of the overdrawn condition of the SEF account. When he did inform the board of that condition, sometime in late July, 1971, he told them that he would take full responsibility for honoring the checks, and would not allow the general ledger bookkeeper to share any of the blame.

Based on the foregoing facts, the jury could properly have concluded that, given what had to be the precarious financial situation of SEF, the natural result of the defendant's honoring of SEF's overdrafts was to injure and defraud the bank, and that the defendant, given his interest and position in SEF, had at the very least acted in reckless disregard of the interests of the bank in honoring the overdrafts. Whether this conclusion is sufficient to warrant a conviction under the law of willful misapplication will now be considered in detail.[7]

### 1. WILLFUL MISAPPLICATION

In support of his contention that the evidence was insufficient to establish a willful misapplication under the statute, defendant makes a two-pronged argument regarding the minimum showing that must be made in order to establish a willful misapplication. He argues first, that the transactions alleged to be unlawful must involve more than the mere honoring of overdrafts. Second,

he contends that the requisite willfulness is not established unless it is shown that the defendant knew that his actions were prohibited by law.

There is no law specifying what transactions must be involved in order to establish a misapplication within the meaning of the statute. While there is language in several cases to the effect that the honoring of overdrafts without more is not a violation of the statute, see, e. g., Swingle v. United States, 389 F.2d 220 (10th Cir. 1968), United States v. Wiggenhorn, 312 F.2d 289 (9th Cir. 1963), and United States v. Cawthon, 125 F.Supp. 419 (M.D.Ga. 1954), the proper interpretation of that language is that the mere payment of overdrafts in the absence of any other evidence that the payment was made with the requisite intent (to injure and defraud the bank) does not constitute a violation of the statute. See, e. g., United States v. Wiggenhorn, supra (dismissal of indictment alleging willful misapplication affirmed where indictment merely alleged the drawing and cashing of overdrafts; the court specified that the indictment did not allege that the defendant caused the overdrafts to be honored, or that, but for his position as a bank officer, the checks would not have been honored); and United States v. Cawthon, supra (indictment alleging simply that the defendant had honored a check at a time when there were insuffi-

---

**7.** It was defendant's theory that his honoring of the SEF overdrafts was a good faith act on his part done to ensure the retention by the bank of SEF as a customer, and that his honoring of the overdrafts did not amount to reckless disregard of the bank's interests, inasmuch as he had every reason to believe, at the time he directed the payment of the NSF checks, that SEF would obtain and deposit sufficient funds to cover the amount by which its account was overdrawn. In support of this theory, defendant introduced evidence that as of June 8, 1971, SEF's account at FNB was overdrawn in an amount of over $421,000; that on June 9, 1971, this amount was covered by a deposit to SEF's account of $450,000, which had been obtained as a loan from the Philadelphia National Bank (PNB); that SEF had reason

to expect additional credit from PNB, but that on August 6, 1971, PNB unexpectedly declined to advance SEF any further credit; that at one time SEF had an oral agreement with Heublein, Inc. which provided that Heublein would pay SEF $3 Million for a 15% interest in SEF; and that Heublein unexpectedly reneged on this agreement. Defendant argued that this background establishes that he did not act willfully and did not intend to injure and defraud the bank. Even assuming that the jury found the facts offered as evidence by the defendant, however, it could still have properly concluded that the natural result of the defendant's actions was to injure and defraud the bank and that the defendant had acted in reckless disregard of the interests of the bank.

cient funds in the account dismissed; no allegation that the defendant even knew that there were insufficient funds in the account). What is necessary to constitute a misapplication within the meaning of the statute, regardless what type of transaction is involved (for example, a loan or the honoring of an overdraft), is that there "be a conversion to his own use or the use of some one else of the moneys and funds of the association by the party charged." United States v. Britton, 107 U.S. 655, 666–667, 2 S.Ct. 512, 522, 27 L.Ed. 520 (1882). As the honoring of the overdrafts in the instant case resulted in such a conversion of the bank's funds, it was sufficient to constitute a violation of the statute, as long as there was sufficient evidence to support a finding of willfulness and the requisite intent.

■■ With respect to the element of willfulness, defendant argues that, in order for the jury's verdict to stand, there must have been evidence introduced at trial from which the jury could conclude that, in honoring the overdrafts, the defendant knew he was violating the law and was acting with the purpose of violating the law.[8] It is not the law of this circuit that such a showing must be made in order to support a finding of "willfulness" in the context of a criminal violation. See, e. g., United States v. Malinowski, 472 F.2d 850 (3d Cir. 1973) (court approved the following definition of "willfully" given by the lower court in its charge to the jury in a case in which the defendant had been convicted of willfully supplying false information on a withholding exemption certificate: "An act is done 'willfully' if done voluntarily and intentionally, and with the specific intent to do something the law forbids." Id., at 853). Moreover, the definition offered by the defendant is materially different from the definition of "willfully" contained in the charge to the jury in the present case, a definition that is substantially the same as the definition approved in United States v. Malinowski, supra:

"The word "willfully" means that the act must have been done voluntarily and intentionally, and with specific intent to do something the law forbids; that is to say with bad purpose either to disobey or to disregard the law."

The specific intent required by this definition is the intent to commit the forbidden act "as compared to a genuine misunderstanding of what the law requires . . ." United States v. Martell, 199 F.2d 670, 672 (3d Cir. 1952). I find that there was ample evidence in this case from which the jury could conclude that the defendant acted with the requisite willfulness in honoring the overdrafts of SEF. On the basis of the defendant's instructions, SEF's overdrafts were handled differently from overdrafts of other customers of the bank, and they were handled in a manner that rendered the bank liable for them, in spite of SEF's history of overdrafts. In addition, the president of SEF testified that the defendant had informed him that the bank would honor SEF's checks even though there were insufficient funds in SEF's account. Moreover, in spite of the large number of NSF checks drawn on SEF's account,

---

8. In support of this contention, defendant offers the definition of "willfully" used in United States v. Mullins, 355 F.2d 883, 886–887 (7th Cir. 1966):

"that the act was committed voluntarily, with knowledge that it was prohibited by law, and with the purpose of violating the law, and not by mistake, accident or in good faith."

This definition was taken from a manual on jury instructions prepared by a committee from the Seventh Circuit Court of Appeals, published in 33 F.R.D. 553 (1965) Defendant's reliance on this definition is misplaced.

The court in *Mullins* did not direct that this definition was the only correct definition of "willfully" in the context of an 18 U.S.C. § 656 case, but merely approved the trial court's use of it in its charge to the jury as not erroneous. Furthermore, the court did not discuss whether such a definition would actually require direct evidence that the defendant knew his actions were prohibited by law and that he acted with the purpose of violating the law. Finally, even if the *Mullins* definition entailed such a requirement, it is not the law of this circuit. See *infra*.

and in spite of the large amount by which that account was overdrawn, the defendant did not inform the board of directors of the condition of the account until sometime near the end of the period specified in the indictment. Finally, all this occurred in the context of the defendant having a substantial financial interest in SEF himself. From these facts the jury could reasonably conclude that the defendant acted voluntarily and with specific intent and bad purpose to misapply the funds of the bank, rather than accidentally or under a genuine misapprehension of what the law required him to do under the circumstances.

## 2. INTENT TO INJURE AND DEFRAUD THE BANK

 An intent to injure and defraud the bank, while no longer explicitly required by statute, is still considered an essential element of the crime of willful misapplication. United States v. Schmidt, 471 F.2d 385 (3d Cir. 1972); Logsdon v. United States, 253 F.2d 12 (6th Cir. 1958). The requisite intent may be inferred from the facts and circumstances of the case. Logsdon v. United States, supra; Giragosian v. United States, 349 F.2d 166 (1st Cir. 1965). It need not be shown that the defendant affirmatively intended to injure and defraud the bank, as long as there is evidence that the defendant acted in "reckless disregard of the interests of the Bank," Logsdon v. United States, supra, 253 F.2d at 15, or that he acted with the knowledge that the natural result of his conduct would be to injure or defraud the bank even though this may not have been his motive. United States v. Schmidt, supra, 471 F.2d at 386. Moreover, the fact that the defendant acted in the hope or belief that the welfare of the bank would ultimately be promoted is no defense if the necessary elements of the offense are otherwise present. As the court stated in Galbreath v. United States, 257 F. 648, 656 (6th Cir. 1918), a case similar in several respects to the instant case:

"An intent to injure or defraud, as contemplated by the statute, is not inconsistent with a desire for the ultimate success and welfare of the bank. It may, within the meaning of the law, result from an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank. A wrongful misapplication of funds, even if made in the hope or belief that the bank's welfare would ultimately be promoted, is none the less a violation of the statute, if the necessary effect is or may be to injure or defraud the bank."

 Based on those standards, there was ample evidence in this case to support the jury's conclusion that the defendant acted with the intent to injure and defraud the bank. The defendant knew there were insufficient funds in SEF's account at the time he directed the bookkeeper to honor the overdrafts. Moreover, the defendant was on the finance committee of SEF and was thus in a position to know of the financial position of SEF and of its inability to cover the shortage in its account. Furthermore, the large number of NSF checks, as well as the inordinate amount by which the account was overdrawn, were factors that could have been taken into account by the jury. Based on those facts, which the jury heard in the context of knowing that the defendant had a substantial financial interest in SEF himself (and therefore had reason to act adversely to the bank's interests where SEF's interests were involved), the jury could have reasonably concluded that the defendant acted in reckless disregard of the bank's interests by directing the honoring of SEF's overdrafts, and that the natural result of his actions, given the financial situation of SEF, was to injure and defraud the bank.

In sum, all the elements necessary for a conviction of willful misapplication under 18 U.S.C. § 656 being sustained by the evidence, defendant's motion for judgment of acquittal must be denied.

## NEW TRIAL

Defendant argues that a new trial is required in this case in the interests of justice, and advances several grounds in support of his motion. Each ground will be identified and discussed in the order raised by the defendant.

■■■ Defendant's first contention is that he was prejudiced by not being able to obtain pretrial discovery of the minutes of the grand jury testimony, and by not having a transcript of the grand jury proceedings to use during trial for impeachment purposes. In an opinion filed August 21, 1974, this Court denied defendant's motion for pretrial discovery of the grand jury testimony because the defendant had not demonstrated the "particularized need" that must be shown before such discovery is allowed. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). For the reasons stated in that opinion, defendant was not entitled to pretrial discovery of the grand jury testimony, and was properly refused a transcript of the grand jury proceedings.[9]

■■■ Defendant next argues that he was prejudiced by the government's use of post-indictment discovery as a tactical device to obtain evidence prior to trial. This argument is based on the facts that the indictment on which defendant was convicted superseded an earlier indictment which was ultimately dismissed, and that during the period between the return of the two indictments the government continued to investigate the defendant's activities. See the opinion filed August 21, 1974 for a complete description of the occurrences prior to defendant's trial. Essentially, those pretrial facts are that the defendant was originally charged on October 11, 1972 in a one-count indictment with making false entries in violation of 18 U.S.C. § 1005; that, following the filing by defendant of several pretrial motions, among them a motion to dismiss the one-count indictment on the ground of duplicity, and two pretrial conferences conducted by this court, the grand jury returned a superseding indictment of 109 counts against the defendant on March 27, 1974, on 92 of which the defendant was convicted (see note 3, supra); and that the government dismissed the original one-count indictment on April 30, 1974.

Defendant's argument that the government engaged in impermissible post-indictment discovery in this case is without merit. The leading case with respect to such discovery is In re National Window Glass Workers, 287 F. 219 (N.D.Ohio 1922). In that case, a federal grand jury in the Southern District of New York had already returned an indictment charging defendants with violations of the Sherman Anti-Trust Act when the government sought to compel defendants' appearance before a grand jury in the Northern District of Ohio for the purpose of producing documents and giving testimony pursuant to an investigation by the Ohio grand jury of the same activities which had given rise to the indictment by the New York grand jury. The government was not seeking a superseding indictment in Ohio, but intended to first try the defendants on the New York indictment, and then try the defendants on the Ohio indictment only if the New York prosecution failed for lack of jurisdiction. After expressly finding that the dominating purpose of the Ohio investigation was to examine witnesses in advance of the trial in New York and to obtain documents and evidence for use in the New York trial, the court ordered that the Ohio grand jury investigation be restrained and that the outstanding sub-

---

9. In addition, it should be noted that a transcript of the grand jury proceedings was apparently never available, not even to the government. At a pretrial conference the government attorney informed the Court that, although the grand jury proceedings had been transcribed, the government had never received a transcript, and that the reporter who had transcribed the proceedings had either destroyed or misplaced her notes and thus could not at that point prepare a transcript.

poenas be vacated and set aside until the government either had tried the defendants in New York, or had filed a satisfactory stipulation evidencing an intention to try the defendants first upon any indictment that might be returned by the Ohio grand jury. See also United States v. Doe, 455 F.2d 1270 (1st Cir. 1972); United States v. Star, 470 F.2d 1214 (9th Cir. 1972). In this case, by contrast, any investigation conducted by the government after the return of the original indictment led to the return of a genuinely superseding indictment, which charged offenses in addition to, and different from, the offense charged in the original indictment, and to a dismissal of the original indictment. Furthermore, in addition to that major factual distinction between this case and the cases involving impermissible post-indictment discovery, there is absolutely no evidence in this case that the government engaged in any improper post-indictment investigation for the purpose of preparing an already pending indictment for trial.

■ Defendant next argues that a new trial should be granted because the jury was confused and prejudiced by the presentation at trial of evidence pertaining to the counts charging him with false entries in violation of 18 U.S.C. § 1005. Those counts were dismissed at the conclusion of the presentation of the government's case. See note 3, supra. Defendant, of course, adduces no evidence in support of his contention that the jury was thus confused and prejudiced, and I conclude, in any event, that the trial was not so complex as to confuse the jury to the defendant's prejudice. Moreover, any confusion that may have been caused at the trial of this case was cleared up by the Court's instructions to the jury.

■ Defendant next contends that his inability to call as witnesses at trial 8 of the 11 other directors of FNB, because of their death or incapacity, resulted in such prejudice to him as to warrant the granting of a new trial. The short answer to this contention is that the reason offered is more a ground for the dismissal of the indictment than a basis for a new trial, as those 8 directors would be equally unavailable at any future trial. To address defendant's contention of prejudice more directly, however, the fact is that the unavailability of these directors was offered in support of a pretrial motion to dismiss the indictment on the grounds of denial of the right to a speedy trial and prejudicial pretrial delay. At a hearing on that motion conducted by this Court on September 9, 1974 (during which, incidentally, the government acknowledged the unavailability of only 6 of the directors), defendant's counsel, when asked by the Court, did not indicate that he would have called the other FNB directors even if they had been available, and did not indicate what the nature of their testimony would have been if they had been called to testify. In addition, defendant failed to call at trial any of the directors who were available to testify. Thus, I conclude that the defendant was not prejudiced by the unavailability, because of death or incapacity, of some of the FNB directors.

The remaining grounds in support of defendant's motion for a new trial are scattergun accusations of prejudicial conduct and statements of government counsel, both prior to and during the trial. After careful consideration of those remaining grounds, I conclude that they are without merit. Accordingly, none of defendant's grounds in support of his motion for a new trial being meritorious, that motion must be denied.

## SPEEDY TRIAL AND PREJUDICIAL PRETRIAL DELAY

■ As mentioned, supra, a pretrial hearing was conducted by the Court on defendant's motion to dismiss the indictment on the grounds (1) that he had been denied his right to a speedy trial, (2) that he had been prejudiced by

prosecutorial delay, and (3) that because of unnecessary delay this Court should dismiss the indictment under Rule 48(b), F.R.Crim.P. On the basis of that hearing, as well as the briefs and affidavits submitted by the parties, I concluded prior to trial that the defendant had not demonstrated any prejudice on account of the lapse of time between the return of the initial indictment and the date that the pretrial hearing was conducted, which was approximately a week before his trial began, and that whatever delay was involved in that lapse of time, given the failure of defendant to demonstrate any prejudice, was explicable and justified by the many pretrial motions filed by the defendant and by the necessity for investigation of the complex and voluminous records involved in the case. See four-factor test elaborated in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). See also United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed. 2d 468 (1971), in which the Court held that the Due Process Clause of the Fifth Amendment provides a basis for dismissal of an indictment only if the defense can show at trial that prosecutorial delay has prejudiced the right to a fair trial. Defendant's motion was denied prior to trial in a brief order dated September 12, 1974.

Defendant has in effect renewed his motion at this point by arguing that the Court erred in denying his pretrial motion to dismiss the indictment. He has made, however, only a general allegation that the Court so erred, and has not offered any examples from the trial that would tend to show that he was prejudiced by any delay. After careful consideration of the events at trial, I once again conclude that there is no evidence that the defendant was prejudiced by any delay in being brought to trial. As discussed, supra, the defendant has demonstrated no prejudice by the unavailability of some of the other directors of FNB. Moreover, there was no evidence of any memory lapses on the part of any

witnesses who testified at trial. In short, there are no signs in this case that the conduct of the defense was in any way impaired by the delay in bringing the defendant to trial. In addition, the defendant was not incarcerated prior to trial. In sum, I conclude that the indictment should not have been dismissed because of any delay in bringing the defendant to trial.

Defendant's motions will be denied.