**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Eldson McGHEE, Amelia Kendricks and**
**Robert Lee Bunner, Defendants-**
**Appellants.**

**No. 73-1273.**

United States Court of Appeals,
Fifth Circuit.

Jan. 28, 1974.

Rehearing Denied March 11, 1974.

R. Rabider, Markwalter, Macon, Ga. (court-appointed), for McGhee.

William T. Exum, Macon, Ga. (court-appointed), for Kendricks.

Manley F. Brown, Macon, Ga. (court-appointed), for Bunner.

William J. Schloth, U. S. Atty., O. Hale Almand, Jr., Asst. U. S. Atty., Macon, Ga., for plaintiff-appellee.

Before GODBOLD, DYER and GEE, Circuit Judges.

GODBOLD, Circuit Judge:

 Bunner, Kendricks, and McGhee were convicted on three counts of aiding and abetting the commission of a bank robbery, 18 U.S.C. §§ 2, 2113, and one count of conspiracy, *id.* § 371. Each received life for bank robbery[1] and five years for conspiracy, sentences to run consecutively. All claim that the bank robbery counts, Counts I–III, were fatally defective because of the omission of an essential element of the crime—a taking "from the person or presence of another" within the terms of 18.U.S.C. § 2113(a). Although we agree with defendants as to Count I,[2] we hold that Counts II and III were sound, and finding their other contentions without merit, we affirm.

*I. The indictment issue.*

The contours of the omitted element doctrine are uncertain. Supreme Court decisions elaborating on the requirements of the liberal federal pleading standards appear to recognize a difference between, on the one hand, indictments that omit an essential element and thus fail to charge an offense and, on the other hand, indictments that suffer from nonprejudicial technical deficiencies. In Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861, 865 (1932), the Court set out the "true test" of the sufficiency of an indictment:

> whether it contains the elements of the offense intended to be charged, *and* "sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceed-

ings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." [Citations omitted; emphasis added.][3]

The Court reemphasized that "[i]t, of course, is not the intent of § 1025 [a forerunner of Rule 52(a), F.R.Crim.P.] to dispense with the rule which requires that the essential elements of an offense must be alleged; but it authorizes the court to disregard merely loose or inartificial forms of averment." *Id.* at 433, 52 S.Ct. at 420, 76 L.Ed. at 866.

*Hagner* itself was a "merely loose or inartificial forms of averment" case. Charged with mail fraud, the defendant challenged the indictment for failure to state that the allegedly fraudulent letter had been knowingly caused "to be delivered by mail according to the direction thereon." Since the indictment did state that defendant had deposited the letter, addressed, at a post office, no omitted element was found and the conviction was affirmed.

United States v. Debrow, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953), demonstrated the proper scope of the *Hagner* fairness test. A perjury indictment was sustained over the objection that it had failed to specify the name and oath-giving authority of the person who had sworn the defendant. The Court held that the name and authority were not essential elements.[4] For a crime to have occurred, however, it was essential that the oath had been authorized by a law of the United States. The indictment stated that the oath had been "duly taken." Employing the fairness test, the Court concluded that "duly

---

1. The District Court sentenced under only the most serious of the bank robbery counts, which alleged the taking of a hostage in the course of a robbery.

2. Under the interpretation this court has placed on F.R.Crim.P. 12(b) in Walker v. United States, 342 F.2d 22 (CA5), cert. denied, 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97 (1965), defendants may raise the omitted element challenge even though they failed to object at trial.

3. The italicized "and" in the quotation in text lends support to the proposition that the all-elements requirement is separate from the specificity requirement.

4. The decision rested in part upon the repeal by Congress of an earlier version of the perjury statute.

taken" amounted to "authorized by a United States law." [5]

Our past decisions rigidly observe the all-elements requirement. In Walker v. United States, 342 F.2d 22 (CA5), cert. denied, 382 U.S. 859, 86 S.Ct. 117, 15 L. Ed.2d 97 (1965), we considered a check forgery indictment averring that defendant acted with intent to defraud. The statute under which defendant was charged specified that the forgery must be committed with intent to defraud *the United States*. We held the indictment defective, and rejected the Government's argument that the defect was somehow curable by the "implications" of other language in the indictment. *See also* Honea v. United States, 344 F.2d 798 (CA5, 1965); United States v. Randolph, 460 F.2d 367 (CA5, 1972); United States v. Leigh, 487 F.2d 206 (CA5, 1973); United States v. Pollard, 486 F. 2d 190 (CA5, 1973).

■ This circuit's purist view of the need to state all elements of an offense leads us to conclude that Count I of the bank robbery indictment against Bunner, Kendricks, and McGhee should have been dismissed. Subsection (a) of 18 U.S.C. § 2113 is as follows:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or

· Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

The two parts of the subsection are separable. · The first criminalizes the usual gun and mask form of bank robbery, while the second covers, for example, nighttime bank break-ins not involving danger to employees or customers. Our decision in United States v. Cook, 443 F.2d (CA5, 1971), made clear that when the asserted crime is a violation of the first part of subsection (a), a taking from the person or presence of another is an essential emement.

The words of Count I [6] show that the Government was relying solely on the first part of subsection (a). There was no allegation, however, that defendants took money from the person or presence

<hr/>

5. Language in Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240, 250–251 (1962), may cast some doubt on the purity of the distinction between the all-elements requirement and the requirement of sufficient specificity to put a defendant on notice and protect against double jeopardy. In *Russell* the Court seemed, at least syntactically, to employ a unitary fairness test in measuring adherence to both requirements. On the other hand, the *Russell* holding arguably shored up the distinction by drawing a line between indictment insufficiencies that can be corrected by amending and those that go to an essential element of the crime and therefore are uncorrectable except by resubmission to a grand jury. At least one scholar has suggested that the "requirement that every ingredient or essential element of the offense should be alleged must be read in the light of the fairness test . . . ." Wright, Federal Practice and Procedure § 125 at 234 (footnotes omitted).

6. "[Defendants,] aided and abetted by one another, willfully and unlawfully and with felonious intent, by force, violence and by intimidation, did take from the First State Bank, Marshallville, Georgia, the sum of $34,173.84, more or less, in money belonging to and in the care, custody, control, management and possession of the First State Bank, Marshallville, Georgia, the deposits of which were then insured by the Federal Deposit Insurance Corporation; all in violation of 18 USC § 2, i/c/w/ 18 USC § 2113(a)."

of another. The omission is fatal to Count I.

■ Count II is not defective. It reads:

[Defendants] aided and abetted by one another, willfully, unlawfully and with felonious intent, did take from the First State Bank, Marshallville, Georgia, the sum of $34,173.84, more or less, in money belonging to and in the care, custody, control, management and possession of The First State Bank, Marshallville, Georgia, the deposits of which were then insured by the Federal Deposit Insurance Corporation; and [defendants] aided and abetted by one another, in committing *the aforesaid acts*, did assault Mrs. Marian Peterson, Mrs. Leona Layfield, and Miss Barbara Pritchett and others, and thus did put in jeopardy the lives of Mrs. Marian Peterson, Mrs. Leona Layfield, and Miss Barbara Pritchett and others, by the use of dangerous weapons, to-wit: a revolver and a shotgun; all in violation of 18 USC § 2, i/c/w/ 18 USC § 2113 (d). [Emphasis added.]

The material in the count referred to by the words, "the aforesaid acts," although insufficient to allege a subsection (a) offense, properly states a subsection (b) offense.[7] Since § 2113(d) penalizes

Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device . . .,

Count II sufficiently alleges a subsection (d) crime.

Count III sets out to allege a subsection (e) violation. Subsection (e) reads:

Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

■■ In the present context the necessary elements are (1) the taking of a hostage (2) in the course of committing some other § 2113 offense. The operative part of Count III is as follows:

[Defendants,] aided and abetted by one another, and while committing and attempting to commit the offense charged *herein,* did force Barbara Pritchett to accompany them from the First State Bank, Marshallville, Georgia, without consent of the said Barbara Pritchett; all in violation of 18 USC § 2, i/c/w/ 18 USC § 2113(e). [Emphasis added.]

"Herein" refers to the other bank robbery counts in the indictment. Since Count II adequately alleges a subsection (d) offense as discussed above, the requirement that the hostage be taken in the course of committing some other § 2113 offense is met.

## II. *In-court identifications.*

■ Bunner challenges the admission of certain in-court identifications. There was no formal showup, but three witnesses, Nassamer, Pritchett, and Layfield, saw him with other defendants in handcuffs and chains at a pretrial hearing. Bunner argues, as did the defendant in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), that in the circumstances the pretrial viewings were so conducive to mistaken identification that he was denied due process of law. Although we are inclined to think that in the totality of the surrounding circumstances there was no substantial likelihood of irrepar-

---

7. Section 2113(b) essentially criminalizes bank larceny.

able misidentification,[8] there is no need for us to decide that issue here. The unchallenged testimony of at least two other eyewitnesses provided ample evidence to support Bunner's conviction.

■ Kendricks' challenge to the in-court identifications made by witnesses Rowland and Howell rests on essentially the same ground as Bunner's objections, except that she complains of a display of photographs viewed by the witnesses a few days before the trial. She argues that the photographs were highly suggestive in that all except the one of her were of poor quality, out of focus, blurred, and blotched. We have scrutinized the photographs with great care and we conclude that the display, taken as a whole, was not overly suggestive.

■ Bunner and Kendricks seem to suggest that the government's failure to display them to the witnesses before trial in a properly-conducted lineup was somehow violative of their rights. In actuality no lineup or formal showup was held and no right to a lineup exists. *Cf*. Stanley v. Cox, 486 F.2d 48 (CA4, 1973).

### III. Constitutionality of the punishment provision of 18 U.S.C. § 2113(e).

■ All three defendants contend that Pope v. United States, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), rendered the punishment provision of § 2113(e) wholly unconstitutional by invalidating the subsection's death penalty clause.[9] The short answer is that in *Pope* the Supreme Court specifically stated that the defendant, who had been sentenced to death, was to be resentenced. Had the Court deemed the non-death portions of subsection (e) nonseparable and therefore invalid, such a disposition would have been improper.

Defendants argue further that if pruned to avoid constitutional offensiveness, subsection (e) must fall, because by setting no maximum term[10] it leaves too much power over sentencing in the trial court—power that should reside with Congress. We find no merit in this argument. While the punishment provision in subsection (e) as judicially trimmed may be unusual in its wording, it does not offend the Constitution or traditional notions of separation of powers.

■ Defendant Kendricks complains of the discrepancy between the life-plus-five sentence she received and the term imposed on one of her partners in crime, Crawford, who pleaded guilty.[11] Crawford's misdeeds may have been more atrocious than hers, but absent some statutory or constitutional infirmity, neither of which is present here, sentencing is within the discretion of the trial judge.[12]

---

8. Pritchett was taken hostage and before her escape spent twelve hours with Bunner and two of his fellow bank robbers who are not parties to this appeal. Nassamer and Layfield had ample opportunity to observe Bunner face to face during the course of the crime, which occurred in broad daylight. Although Bunner wore no mask, he wore a wig during part of the crime. Most of Pritchett's observation of him, however, occurred during his flight, when he was wigless.

9. The *Pope* decision, which rested on the same ground as United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), invalidated the death penalty clause as placing an impermissible burden on the right to jury trial. Before *Pope* a defend-

ant willing to waive jury trial was assured of not being sentenced to death, since the statute as it stood gave a jury, but not the judge, power to assess the death sentence.

10. Striking out the death penalty clause, we are left with the command that a convicted person "shall be imprisoned for not less than ten years."

11. Crawford received 30 years for bank robbery and five for conspiracy, sentences to run concurrently.

12. Under Rule 35, F.R.Crim.P., Kendricks is free to move for reduction of sentence in the District Court within 120 days after the issuance of this court's mandate affirming her conviction.

## IV. SUFFICIENCY OF THE EVIDENCE

### A. McGhee's participation.

Defendant McGhee insists that the evidence was insufficient to convict him on Counts I–III. Viewing the evidence in the light most favorable to the Government, see Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1942), we conclude that the jury was justified in finding him guilty beyond a reasonable doubt. According to the uncontradicted and largely unimpeached testimony, he was an active participant in the planning of the crime. He performed several acts to aid in putting the plan into effect, for example, placing a rifle in the putative get-away van, registering at a motel near the scene of the crime on behalf of all the robbers, and accompanying the robbers while the van was being hidden outside the town where the crime took place. He also accompanied them into town in a Cadillac, and consistent with the plan that he was to act as get-away driver, he took over the wheel of the Cadillac and drove at least twice around the block after the other robbers had disembarked. Finally, he was apprehended while heading out of town in a car with defendant Kendricks shortly after the robbery, under circumstances that would justify the inference that he was making for the cached get-away van. He falsified his identity upon being stopped and questioned and (inferably) lied about his destination and purpose.

### B. Bunner's sanity.

Bunner, who waived his right to jury trial, raised the defense of insanity, and now contends that as a matter of law the evidence established a reasonable doubt as to his sanity at the time of the commission of the crime. The chief bulwarks of his argument are the testimony of his psychiatrist, Dr. Bullock, a document relating to his 13-month sojourn in a Florida mental hospital ending 30 months before the crime, and a document showing that the Social Security Administration had awarded him payments based on mental impairment. The government presented its own psychiatrist, Dr. Eardlay, who created a conflict in the evidence by testifying that in his opinion Bunner was sane. It was proper for the District Judge, as fact-finder, to resolve the conflict,[13] and we are not able to say that he erred.

### V. Trial errors.

In the course of the charge to the jury the following exchange occurred:

THE COURT: Now, of course, the fact that these two defendants who are on trial—and their names I remind you, are Eldson McGhee and Amelia Kendricks—have entered pleas of guilty forms the issue that you ladies and gentlemen are trying.

MR. EXUM: Your Honor, excuse me, I may have misunderstood you but I thought you said these defendants have entered pleas of guilty.

THE COURT: I may have inadvertently said that. I didn't mean to. The fact they have entered pleas of not guilty, obviously, forms the issue that you ladies and gentlemen are to try.

No prejudice could possibly have flowed from this obvious slip of the tongue, which was corrected quickly. Nor does the record support Kendricks' contention that the trial judge prejudiced defendant's case by intervening on behalf of the government. Compare United States v. Hoker, 483 F.2d 359 (CA5 1973), in which the judge asked defendant more than 150 probing questions and projected a hostile, disbelieving attitude toward him.

Affirmed.

13. In a post-trial memorandum the District Judge noted that he credited Dr. Eardlay over Dr. Bullock. Dr. Bullock had painted Bunner as a dependent personality with deep inferiority feelings and a general inability to perform in a positive, goal-oriented manner. Yet the evidence adduced at trial pertaining to the crime showed that Bunner was capable of sustained and positive, if not brilliant, executive action.