UNITED STATES of America, Appellee,

v.

Theodore J. S. CALDWELL, Appellant.

No. 75–2149.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 4, 1976.
Decided Aug. 17, 1976.

Zane Grey Staker, Kermit, W. Va., for appellant.

Frank E. Jolliffe, Asst. U. S. Atty., Charleston, W. Va. (John A. Field, III, U. S. Atty., Charleston, W. Va. and Michael F. Pezzulli, Third Year Law Student, on brief), for appellee.

Before WINTER, RUSSELL, and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

Theodore J. S. Caldwell, Chairman of the Board of Directors of the First Huntington National Bank of Huntington, West Virginia (bank), was convicted on each count of a twelve-count indictment, and he appeals. Together with John H. Kelly, State Trea-

surer of West Virginia, Joseph F. Rykoskey, Assistant State Treasurer of West Virginia, and Coleman Trainor (as to whom the government subsequently dismissed the indictment), defendant was indicted on four counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts One–Four) and eight counts of misapplication of bank funds in violation of 18 U.S.C. §§ 656 and 2 (Counts Five–Twelve). The theory of the prosecution was that the several codefendants used the mails to perpetrate a scheme to bribe Kelly and Rykoskey (who were alleged to be clothed with authority, under state law, to designate state depositories and to determine the amounts of state funds to be deposited in each) to prefer the bank in the deposit of state funds in non-interest-bearing accounts, and misapplied bank funds in payment of these bribes.[1]

Defendant's attack on the validity of his convictions is limited to the contentions that (a) each count of the indictment is legally insufficient to charge him with an offense against the United States, (b) the evidence adduced against him was legally insufficient to show either the existence of a scheme or artifice to defraud or that the use of the mails constituted an essential step in the execution of the scheme, and (c) the evidence adduced against him was legally insufficient to show a willful misapplication of bank funds with specific intent to injure or defraud the bank. We find merit in none of these contentions and we affirm.

## I.

Before discussing defendant's specific contentions, we state the basic proof which the government adduced.

Viewed in the light most favorable to the government, the evidence showed that, pursuant to a practice which began as early as 1961 or 1962, the State Treasurer and the Assistant State Treasurer of West Virginia would attend the West Virginia Bankers Association meetings at the Greenbrier, White Sulphur Springs, West Virginia, a luxury resort hotel, at the invitation of the chairman of the board of the bank and at the bank's expense. Defendant became chairman in 1968, and from then until 1973 he invited Kelly and Rykoskey and their wives to attend the meetings, and he caused their expenses to be paid out of the funds of the bank. No limitation was placed on the duration of the stay nor the expenses that could be incurred.

Under state law, but subject to certain restrictions, Kelly had the authority and duty to deposit all funds of the State of West Virginia in financial institutions of his selection and to decide whether these funds would be deposited in interest-bearing or non-interest-bearing accounts. Rykoskey handled day-to-day deposits.

During the Christmas seasons of 1971, 1972 and 1973, defendant visited Kelly and Rykoskey at their offices and gave each a dozen golf balls and cash in varying amounts from $400 to $500. Defendant also gave Kelly a political contribution of $3,000 in 1972. The making of this contribution is not a subject of prosecution and, indeed, it is not suggested that the making of it was in itself illegal.

Kelly and Rykoskey testified that as a result of the payment of their expenses at the Greenbrier and the other gifts, they favored the bank with large deposits in non-interest-bearing accounts. Kelly specifically stated that he favored the bank in daily decisions as to where to deposit funds and that he kept the deposits at this bank at a high level. Additionally, he would receive and honor defendant's telephone requests, which were usually made in late December of each year, to make additional deposits to better the bank's year-end financial reports.

The records of the bank showed that the Greenbrier expenses of Kelly and Rykoskey for a number of years, including 1970–73, were paid by the bank from its funds; and there was testimony that checks in payment

---

1. Kelly and Rykoskey pleaded guilty to a single charge of mail fraud contained in the indictment naming defendant, and to various charges in other pending indictments. They testified against defendant at his trial.

were mailed to the Greenbrier in the normal course of business. The bank's records showed that West Virginia maintained a general and a welfare account at the bank. The balance in the general account was normally maintained at several million dollars. In December, 1973, total deposits to this account exceeded $11,000,000; a deposit of over $2,600,000 and a deposit of over $3,000,000 were made on December 19 and 28, respectively. The overall balance in the account was reflected in the bank's financial statement as of December 31, 1973.

## II.

Defendant's attack on the legal sufficiency of each count of the indictment is divided into two parts—an attack on Counts One–Four and an attack on Counts Five–Twelve. Counts One–Four are identical except as to dates and years. Count One is appended as an appendix to this opinion.

Similarly, Counts Five–Eleven are identical except as to dates, years and amounts. Count Five is set forth in the appendix of this opinion. Although defendant includes Count Twelve in his attack on the legal sufficiency of the counts founded upon 18 U.S.C. §§ 656 and 2, it is somewhat different from Counts Five–Eleven, and it, too, is set forth in the appendix.

Defendant raised no question of the legal sufficiency of any count prior to trial; nor did he seek particulars. Only after the jury's verdict of guilty on each count did he move in arrest of judgment, asserting legal insufficiency. The district court denied that motion.

### A. Mail Fraud Counts (One–Four).

Defendant argues that Counts One to Four set forth "a grossly divagative and shadowy charge of an illusively asserted 'scheme or artifice,' alleged to have been entered into or begun about January 1, 1966, and ending about January 1, 1975, without mention or reference to date, time, place, act or suggestion of act by defendant in implementation or consummation thereof." The counts are further criticized for failing to allege a connection between the

scheme and the mailings. Overall, it is asserted that these counts are so vague that defendant was "required to joust with a shadow in his undertaking to defend" himself against the indictment returned against him.

▬ We disagree. We think that these counts are legally sufficient. Rule 7(c)(1), F.R.Cr.P., requires that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Under this rule, an indictment is sufficient if it provides the defendant with sufficient facts intelligently to plan his defense. 8 Moore's Federal Practice ¶ 7.04; 1 Wright Federal Practice and Procedure § 125 (1969). In alleging a scheme or artifice to defraud, as well as in alleging the connection between the scheme and the mailings, the indictment here satisfied this requirement. The scheme alleged was (a) to bribe Kelly and Rykoskey to put funds in defendant's bank in non-interest-bearing accounts in violation of their statutory duty to act dispassionately in the performance of their duties, the bribes being, in part, the payment of the costs of certain living and vacation expenses of the codefendants and their wives, (b) to misappropriate bank funds to be paid for the personal use and benefit of the codefendants, and (c) for the codefendants to accept funds in violation of law. The mails were allegedly used to make payment of such expenses and to transmit the misappropriated funds.

Unlike the indictment in *United States v. Curtis,* 506 F.2d 985 (10 Cir. 1974), on which defendant relies, much more was pleaded than the statutory language of § 1341. To the end of alleging the crime charged, Counts One–Four meticulously and with particularity set forth defendants' positions, the applicable West Virginia statutes, the nature of the scheme to defraud, the actions taken by each defendant to carry out the scheme and the specific use of the mails, including the date and addressee of each mailing, in furtherance of the scheme.

▬ The indictment in the instant case is like the indictments which were upheld in

*United States v. Isaacs,* 493 F.2d 1124 (7 Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), and *United States v. Faser,* 303 F.Supp. 380 (E.D.La. 1969). Its theory falls within the rationale of *Sushan v. United States,* 117 F.2d 110 (5 Cir.), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941). Moreover, to the extent that defendant may have considered that he was not fairly apprised of the charges against him, he could have sought a bill of particulars under Rule 7(f), F.R.Cr.P. Having failed to do so, he is largely foreclosed from the present attack by the rule recognized in *United States v. Chinn,* 5 F.R.D. 226 (S.D.W.Va.), aff'd 157 F.2d 1013 (4 Cir. 1946), that an indictment is to be construed more liberally after judgment than before, so that if the indictment contains allegations which clearly express what was meant to be charged although not technically in the language of the statute, any technical deficiency was cured by the conviction and judgment.

B. Misapplication Counts (Five–Twelve)

With respect to these counts, defendant's argument is that they are fatally defective, first, in failing to identify the funds allegedly misapplied. Defendant recognizes that the language of these counts is "said funds," but he asserts that "said" must mean funds identified in that count and not funds identified in any other count, and since there is no other identification in the count itself, the count is defective. Defendant argues that a second defect is contained in the phrase "cause same in the amount of . . . ." He asks, "Cause what? In what connection? With what result? In what direction, involving whom?" [2]

■ We agree with the government that the phrase "said funds" is a valid and permissible incorporation by reference of the allegations concerning the "monies, funds and credits of the First Huntington National Bank" set forth in ¶ 12(b) of Count One, and realleged, by reference, in Counts Two–Four. Incorporation by reference is permissible, *Blitz v. United States,* 153 U.S. 308, 317, 14 S.Ct. 924, 38 L.Ed. 725 (1894); *United States v. Bryant,* 430 F.2d 237, 239 (8 Cir. 1970), and we think that the word "said" is the functional equivalent of "hereinbefore set forth," upheld as a valid incorporation by reference in *Nichols v. United States,* 48 F.2d 46 (5 Cir. 1931). *See also United States v. Bagdasian,* 291 F.2d 163 (4 Cir.), cert. denied.

■ Although we agree that the use of the phrase "cause same," as alleged in Counts Five–Eleven, does not result in a model of written clarity, we nevertheless do not deem these counts legally insufficient. If the challenged phrase is omitted, defendant and others are accused of injuring and defrauding the bank by knowingly and willfully embezzling, abstracting, purloining and misapplying the bank's monies, funds and credits in stated sums, and of aiding and abetting one another in this unlawful endeavor. Since defendant is identified as Chairman of the Board of the bank and the misapplied funds as those belonging to the bank, one reading the indictment would hardly suppose that defendant did every act himself, but rather that he instructed his subordinates to do some acts necessary to the misappropriation without fully informing them as to the ultimate purpose of their actions. The phrase "cause same" may therefore be appropriately read to charge simply that defendant, not only as a principal and an aider and abetter, did the illegal acts himself, but also that he *caused* certain of them to be done by others.

■ Certainly Counts Five–Twelve are susceptible of the reading we give them; and if given that reading, they are legally sufficient. Each identifies the relevant date, the principals involved in the illegal act, and the amount of money involved. Any question about their sufficiency could have been raised before trial; and if more details were needed to plan a defense, de-

---

2. Defendant overlooks that the phrase "cause same, etc." does not appear in Count Twelve. It was employed only in Counts Five–Eleven.

fendant could have sought particulars. Under *Chinn*, his failure to do either defeats his postconviction attack on their legal sufficiency.

## III.

■ We have no doubt that the evidence was legally sufficient to show both the existence of a scheme or artifice to defraud and the use of the mails as an essential step in the execution of the scheme. Defendant's argument that the evidence was legally insufficient to show a scheme or artifice to defraud is that he did not initiate the practices complained of; rather it had been the longstanding practice for whoever was chairman of the bank to issue expense-paid invitations to attend the Annual West Virginia Bankers' Association Meeting at the Greenbrier to whoever held the offices of state treasurer and assistant treasurer respectively; and no one ever thought it was wrong. That is, of course, no defense. Even if the law has been violated many times with impunity, that does not render a subsequent violation legal.

Here, the proof showed that defendant used bank funds to provide expense-free junkets for Kelly and Rykoskey, and the circumstances were such that both the providing and the acceptance of the same were in violation of state law. Kelly and Rykoskey both pleaded guilty and testified that the receipt of these favors influenced them in their exercise of the authority vested in them under state law. Indeed, the proof showed that defendant solicited favors from Kelly and Rykoskey and the favors were granted by Kelly and Rykoskey as a *quid pro quo* for what they had enjoyed. It is at once obvious that the fair and impartial execution of the laws of West Virginia was denied her citizens and the rights of the bank and its owners to a proper stewardship of the bank's funds defeated.

■ Nor do we have doubt concerning the sufficiency of the proof to show that the mailings were integral parts of the scheme. Kelly and Rykoskey did what they did in part because of the favors extended to them and their wives at the Greenbrier.

Payment to the Greenbrier for the services and accommodations it provided was essential to the scheme, and defendant elected to make payment by mail. It matters not, as defendant argues, that payment could have been accomplished in some other manner—defendant suggests by dog sled—or that the bank routinely employed the mails for its countless other routine transactions. The use of the mails need not in and of itself be fraudulent to constitute an offense under the statute. Nor is it a good defense that the materials mailed were innocent in themselves if they are part of a scheme to defraud. *Parr v. United States*, 363 U.S. 370, 390, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); *United States v. Vanderpool*, 528 F.2d 1205 (4 Cir. 1975); *United States v. Brewer*, 528 F.2d 492 (4 Cir. 1975). All that is needed is proof that the mails played a significant part in execution of the scheme. That fact was established.

## IV.

■ With regard to his conviction on the misapplication counts, defendant correctly asserts that an essential element of proof for willful violation of 18 U.S.C. § 656 is the intent of the accused to injure or defraud the bank. He contends that such proof is precisely to the contrary because it shows that the bank was benefitted by the sums expended on Kelly and Rykoskey. Thus, he argues that the only proper inference which may be drawn is that defendant's intent throughout was to accomplish that laudable objective for the bank.

■ We reject this argument. The defendant's wrongdoing was complete at the time when he made illegal payments in accommodations and services to Kelly and Rykoskey and their wives; at that point, defendant had misapplied bank funds by using the money for an illegal purpose. Such misapplication injured the bank, and as such gave rise to the inference that the defendant had the requisite intent. *United States v. Schmidt*, 471 F.2d 385 (3 Cir. 1972); *Golden v. United States*, 318 F.2d 357 (1 Cir. 1963); *Mulloney v. United*

*States,* 79 F.2d 566 (1 Cir.), cert. denied, 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468 (1935).

The fact that the defendant had as his ultimate goal the unlawful preferment of the bank by Kelly and Rykoskey is irrelevant. Uniformly it is held that the promise or hope of a better life to come for the bank does not render lawful that which was unlawful. *United States v. Acree,* 466 F.2d 1114 (10 Cir. 1972), cert. denied, 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973); *Golden v. United States,* supra; *Mulloney v. United States,* supra; *Galbreath v. United States,* 257 F. 648 (6 Cir. 1918). Nor is it essential to a conviction that the proof show an intent permanently to deprive the bank of its property. *United States v. Scheper,* 520 F.2d 1355 (4 Cir. 1975); *Golden v. United States,* supra; *Rakes v. United States,* 169 F.2d 739 (4 Cir.), cert. denied, 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948).

Because we find no error, the judgments are

*AFFIRMED.*

WIDENER, Circuit Judge (concurring):

I concur in the result on the mail fraud counts, not for the grounds given in the opinion of the panel, but on account of the line of cases represented by *United States v. States,* 488 F.2d 761 (8th Cir. 1973).

As *Hammerschmidt v. United States,* 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), is not mentioned in our opinion, I think it worthwhile to note it was decided upon the same language in the same statute we now consider. The district court charged the jury partly in the wording of that case, *in haec verba.* But *Hammerschmidt* concerned itself with the violation of another law of the United States by use of the mails, not the violation of a State law as here. Its holding with respect to the mail fraud statute, I think is not dictum as *States* may say. The dictum in *Hammerschmidt,* rather, is in its construction of *Horman v. United States,* 116 F. 350 (6th Cir. 1902), which confined the holding of that case, also on the same statute now before us, to "pecuniary or property injury

inflicted by a scheme to use the mails for the purpose." 265 U.S. at 189, 44 S.Ct. at 512.

*States* was a case in which the mails had been used in a fraudulent scheme to violate State election laws in a State election by the use of trickery or cunning in falsifying voter registration affidavits. It was a prosecution under the mail fraud statute, not the Civil Rights Acts. By affirming the conviction *States* declined to follow the *Hammerschmidt* dictum that the application of *Horman* should be confined to pecuniary or property injury. If affirming, I would simply follow the line of cases exemplified by *States* and say that a violation of State law by trickery or cunning may constitute a scheme to defraud and the use of the mails to carry out the scheme may be found to be a violation of the mail fraud statute.

With respect to the misapplication counts, I concur in the result, not for the reasons given, but because the jury was charged without objection and the evidence supports the verdict.

I must remark that the State of West Virginia did not lose a farthing in any of the machinations charged. Such is neither alleged nor proved. The most that can be said is that her deposits were not distributed throughout the banking system of the State, rather the Huntington bank was favored.

While this may not be good State government, I have serious reservations as to whether it should be a federal crime. This is especially true in this case where the Travel Act, 18 U.S.C. § 1952(a) (see especially § (b)(2)), would apparently cover all or almost all of the acts charged.

In this connection I doubt the advisability of further expansion of the mail fraud statute (and to a lesser extent what I say applies to misapplication) beyond the confines suggested by the *Hammerschmidt* dictum and believe the concurring thoughts of Mr. Justice Jackson (although on conspiracy) in *Krulewitch v. United States,* 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790 (1949), must be taken account of at some

time in the context now before us. I doubt that my dissent here would prevail, and so do not, but suggest the following passage must sooner or later be reckoned with:

"It also may be trivialized, as here, where the conspiracy consists of the concert of a loathsome panderer and a prostitute to go from New York to Florida to ply their trade . . . and it would appear that a simple Mann Act prosecution would vindicate the majesty of federal law. However, even when appropriately invoked, the looseness and pliability of the doctrine present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case." 336 U.S. 440, 445, at 449, 69 S.Ct. 716, at 721.

## APPENDIX

The Grand Jury charges:

### COUNT ONE

1. At all times material herein JOHN H. KELLY was the Treasurer of the State of West Virginia.

2. At all times material herein JOSEPH F. RYKOSKEY was the Assistant Treasurer of the State of West Virginia.

3. At all times material herein THEODORE J. S. CALDWELL was the Chairman of the Board of Directors of the First Huntington National Bank, Huntington, West Virginia.

4. At times material herein COLEMAN TRAINOR was the President of the First Huntington National Bank, Huntington, West Virginia.

5. At all times material herein, Section 61–5–4 of the Code of the State of West Virginia provided in pertinent part:

*Bribery or Attempted Bribery*

If any person shall bribe, by directly or indirectly giving to or bestowing upon, or shall attempt to bribe by directly or indirectly giving to or bestowing upon, any executive, legislative, judicial, or ministerial officer of this State, or any member of the legislature, after his election or appointment and either before or after he shall have been qualified or shall have taken his seat, any gift, gratuity money, testimonial or other valuable thing, or shall make promise thereof, in order to influence him in the performance of any of his official, public duties, or with intent to influence his act, vote, opinion, decision or judgment on any matter, question, cause or proceeding, or to induce or procure him to vote or withhold his vote on any question or proceeding which is then or may thereafter be pending, or may by law come or be brought before him in his official capacity, he shall be guilty of a felony . . . .

6. At all times material herein, Section 61–5–5 of the Code of the State of West Virginia provided in pertinent part:

*Demanding or Receiving Bribes*

Any executive, legislative, judicial or ministerial officer, or member of the legislature, who shall demand, receive or accept any gift, gratuity, money, testimonial or other valuable thing, or shall exact any promise to make such gift or to pay to him, money, testimonial or other valuable thing, or to do any act beneficial to such officer or member of the legislature, from any person, company or corporation, under an agreement or understanding that his vote, opinion, judgment or decision shall be given or withheld in any particular manner upon a particular side of any question, cause or proceeding, which is, or may be by law brought before him in his official capacity, or that in such capacity he shall make any particular nomination or appointment, or for any vote or influence he may give or withhold as such officer or member of the legislature, or that such officer will fail to perform or improperly perform any of his official, public duties, shall be guilty of a felony . . . .

7. From August 14, 1970, and all times since that date, Section 61–5A–3 of the Code of the State of West Virginia provided in pertinent part:

*Bribery in Official and Political Matters*

A person is guilty of bribery under the provisions of this section if he offers, confers or agrees to confer to or upon another, or solicits, accepts or agrees to accept from another, directly or indirectly:

(1) Any pecuniary benefit as consideration for the recipient's official action as a public servant or party official; or . .

(3) Any benefit as consideration for a violation of a legal duty as a public servant or party official.

A person is also guilty of bribery under the provisions of this section if he agrees to render or not to render official action as a public servant or party official as consideration for a pecuniary benefit being offered or conferred to or upon, or as consideration for a promise that a pecuniary benefit shall be offered or conferred to or upon, another person or a party official or a political party. (1970, 2nd Ex. Sess., c. 3.)

8. From August 14, 1970, and all times since that date, Section 61–5A–6 of the Code of the State of West Virginia provided in pertinent part:

*Gifts or Gratuities to Public Servants Prohibited*

It shall be unlawful . . .

(2) For any public servant . . . having any official action to perform in connection with bids, contracts, purchases, claims or other pecuniary transactions of the government to solicit, accept or agree to accept, directly or indirectly, any gift or gratuity from any person known by such public servant to be interested in any such bid, contract, purchase, claim or transaction; or . . .

(5) For any person to offer, give, or agree to give any gift or gratuity prohibited by the provisions of subdivision[s] 2, . . . of this subsection (a). . . .

9. At all times material herein, Section 12–1–5 of the Code of the State of West Virginia provided in pertinent part:

*Demand Deposits; Time Deposits; Payment of Interest on Time Deposits; Time for Payment of Interest; Contracts Concerning Time Deposits, Open Account; Withdrawal of Funds Placed on Time Deposit, Open Account.*

As much money as may be needed for current operational purposes of the state government, as determined by the state treasurer, shall be maintained at all times in the state treasury in cash or in demand deposits with banks designed as depositories in accordance with the provisions of section one [§ 12–1–1] of this article. The state treasurer shall apportion such demand deposits among such depositories, giving due consideration to: (1) The activity of the various accounts maintained therein, (2) the reasonable value of the banking services rendered or to be rendered the State by such depositories, and (3) the value and importance of such deposits to the economy of the communities and the various areas of the State affected thereby.

The state treasurer shall place in time deposits such state funds as are not needed for current operational purposes within in a ninety-day period . . . . .

10. At all times material herein, the State of West Virginia maintained at the First Huntington National Bank a demand deposit account, which said account was managed and controlled by the Office of the State Treasurer of the State of West Virginia.

11. From on or about January 1, 1966, to on or about January 1, 1975, JOHN H. KELLY, JOSEPH F. RYKOSKEY, THEODORE J. S. CALDWELL and COLEMAN TRAINOR, and others whose identity to the Grand Jury is both known and unknown, in the Southern District of West Virginia, and elsewhere, devised and intended to devise a scheme and artifice to defraud:

(a) The State of West Virginia and its citizens of their right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of the official duties by the defendants JOHN H. KELLY and JOSEPH F. RYKOSKEY, in their official capacity as Treasurer and Assistant Treasurer, respectively,

of the State of West Virginia, free from corruption, partiality, willful omission, bias, dishonesty, official misconduct, conflict of interest and fraud;

(b) The State of West Virginia and its citizens of their right to have the business of the State of West Virginia and the office of the State Treasurer conducted honestly, impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest, unlawful obstruction and impairments, and in accordance with the laws of the State of West Virginia.

(c) The stockholders and depositors of the First Huntington National Bank, Huntington, West Virginia, and other persons, firms and corporations associated with the First Huntington National Bank, Huntington, West Virginia, of their right to have the business of said bank conducted honestly, impartially, free from deceit, fraud, dishonesty, conflict of interest and unlawful obstruction and impairments, and in accordance with the laws of the State of West Virginia and the United States of America.

12. The scheme and artifice to defraud is more fully set forth as follows:

(a) It was a part of the scheme and artifice to defraud that JOHN H. KELLY and JOSEPH F. RYKOSKEY, in their official capacity as Treasurer and Assistant Treasurer, respectively, of the State of West Virginia, would deposit and maintain and cause to be deposited and maintained large sums of monies of the State of West Virginia in a non-interest bearing, demand deposit account at the First Huntington National Bank, all to the detriment of the State of West Virginia and its citizens as aforesaid.

(b) It was further a part of the said scheme and artifice to defraud that THEODORE J. S. CALDWELL and COLEMAN TRAINOR would and did pay and cause to be paid with the monies, funds and credits of the First Huntington National Bank, certain sums of money for the personal use and benefit of JOHN H. KELLY and JOSEPH F. RYKOSKEY.

(c) It was further a part of the scheme and artifice to defraud that JOHN H. KELLY and JOSEPH F. RYKOSKEY would and did accept the monies so paid as set forth in the immediately preceding paragraph for their own personal use and benefit.

13. For the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, THEODORE J. S. CALDWELL, COLEMAN TRAINOR and JOHN H. KELLY, on or about August 14, 1970, knowingly and willfully placed and caused to be placed in the United States mails, an envelope containing a check, said envelope being addressed to "The Greenbrier, White Sulphur Springs, West Virginia 24986," to be sent and delivered according to the directions thereon by the Post Office Department of the United States (now the United States Postal Service); all in violation of Title 18, United States Code, Section 1341.

\*   \*   \*   \*   \*   \*

## COUNT FIVE

On or about the 14th day of August, 1970, at Huntington, Cabell County, West Virginia, in the Southern District of West Virginia, and elsewhere, THEODORE J. S. CALDWELL, then being Chairman of the Board of Directors of the First Huntington National Bank, and COLEMAN TRAINOR, then being President of said bank, and JOHN H. KELLY, then being Treasurer of the State of West Virginia, aided and abetted by each other, did, with the intent to injure and defraud said bank, knowingly and willfully embezzle, abstract, purloin, and willfully misapply said monies, funds and credits of the First Huntington National Bank . . . in the amount of Two Hundred Eighty-Two Dollars and Forty-One Cents ($282.41), which said monies, funds and credits were in the care and custody of THEODORE J. S. CALDWELL and COLEMAN TRAINOR, by virtue of their positions at said bank; all in violation of Title 18, United States Code, Sections 656 and 2.

\*   \*   \*   \*   \*   \*

## COUNT TWELVE

On or about the 27th day of August, 1973, at Huntington, Cabell County, West Virginia, in the Southern District of West Virginia, and elsewhere, THEODORE J. S. CALDWELL, then being Chairman of the Board of Directors of the First Huntington National Bank, and COLEMAN TRAINOR, then being President of said bank, and JOSEPH F. RYKOSKEY, then being Assistant Treasurer of the State of West Virginia, aided and abetted by each other, did, with the intent to injure and defraud said bank, knowingly and willfully embezzle abstract, purloin, and willfully misapply said monies, funds and credits of the First Huntington National Bank in the amount of Two Hundred Two Dollars and Eighty-Six Cents ($202.86), which said monies, funds and credits were in the care and custody of THEODORE J. S. CALDWELL and COLEMAN TRAINOR, by virtue of their positions at said bank; all in violation of Title 18, United States Code, Sections 656 and 2.