**UNITED STATES of America,**
**Appellant,**

v.

**James A. CONLON.**

No. 79–2283.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 15, 1980.
Decided April 16, 1980.

G. Allen Carver, Jr., Atty., Dept. of Justice, Washington, D.C., with whom Robert S. Tignor, Atty., Dept. of Justice, Washington, D.C., was on brief, for appellant.

Plato Cacheris, Alexandria, Va., with whom Larry S. Gondelman, Washington, D.C., was on brief, for appellee.

Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge, and WILKEY, Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

James A. Conlon was charged in a four count indictment with three counts of false declaration before the grand jury[1] and one count of conflict of interest.[2] The district court dismissed all four counts. The government appealed. We affirm the dismissal of the false declaration counts, adopting the opinion of the court below insofar as it deals with them.[3] However, we reject the district court's analysis of 18 U.S.C. § 208(a),[4] and reverse the dismissal of the conflict of interest count. Our discussion will be confined to that count.

## I. FACTS

Until July 1, 1977, appellee Conlon was the Director of the Bureau of Engraving and Printing. From that date, he has been

---

1.  18 U.S.C. § 1623(a) (1977).

2.  18 U.S.C. § 208(a) (1977).

3.  *United States of America v. James A. Conlon* (D.D.C., Criminal No. 79–380, September 28, 1979). Joint Appendix (J.A.) 314–18. We do not read the opinion below as preventing the government from filing perjury charges against the defendant in an indictment that is more precisely drawn. We note that there is no problem with the statute of limitations in this case. *See* 18 U.S.C. § 3282 (1976); *see also* 18 U.S.C. §§ 3288–89 (1976).

4.  *United States of America v. James A. Conlon* (D.D.C., Criminal No. 79–380, October 20, 1979). J.A. at 367–97.

the President of ABN Development Corporation, a subsidiary of the American Bank Note Company (ABN). Beginning in December, 1976, the Bureau of Engraving and Printing and the Federal Reserve Board were entertaining the possibility of substituting a security signature system for United States currency developed by the American Bank Note Company for a similar system which they had been developing themselves. The government contends that, from December 1976 through June 1977, Conlon participated substantially in the decisionmaking process regarding this proposed replacement system. It further contends that, during the same period, he was negotiating and had an arrangement concerning prospective employment with the American Bank Note Company. Based upon these contentions, the government sought and obtained a grand jury indictment charging Conlon with a violation of 18 U.S.C. § 208(a),[5] the conflict of interest law. The indictment read:

In the period from on or about December 1976 through June 1977, in the District of Columbia, JAMES A. CONLON, the Defendant, being an officer and employee of the executive branch of the United States Government, that is, the Director of the United States Bureau of Engraving and Printing, unlawfully and knowingly did participate personally and substantially as such officer and employee, through decision, recommendation, and the rendering of advice, in a proposal of the American Bank Note Company for a Security Signature System for U.S. Curren-cy, a particular matter in which to his knowledge the American Bank Note Company, a company with which he was negotiating and had an arrangement concerning prospective employment, had a financial interest.[6]

The trial judge denied Conlon's motion to dismiss the indictment,[7] and granted his motion for a bill of particulars.[8] In that bill, Conlon sought the following information regarding the conflict of interest charge:[9]

(1) Whether the government was alleging that he had made a recommendation. If so, the date, content and form (written or oral) of the recommendation.

(2) Whether the government was alleging that he had rendered advice. If so, the date, content and form (written or oral) of the recommendation.

(3) Whether the government was alleging that he had made a decision. If so, the date, content and form (written or oral) of the decision.

(4) The date or dates upon which the government was contending that he had negotiated with ABN, including where and with whom the negotiations took place and the substance of the negotiations.

(5) The date or dates upon which the government was contending that he had an arrangement concerning prospective employment with ABN, including whether the arrangement was written or oral, whether a date for the prospective employment had been set, and with whom

5. 18 U.S.C. § 208(a) provides in relevant part:
. . . whoever, being an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or of the District of Columbia, including a special government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest or other particular matter in which, to his knowledge, he, his spouse, minor child, part-ner, organization in which he is serving as officer, director, trustee, partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—
Shall be fined not more than $10,000 or imprisoned not more than two years, or both.

6. J.A. at 1.

7. J.A. at 314.

8. J.A. at 319.

9. J.A. at 11–12.

and where such arrangements were made.

The government responded in detail to the first three inquiries. It listed seven dates—December 7, 1976; December 22, 1976; April 21, 1977; May 10, 1977; May 17, 1977; June 21, 1977; and June 24, 1977 —on which Conlon allegedly made recommendations and rendered advice concerning ABN's proposal. It listed four dates—December 7, 1976; April 21, 1977; May 10, 1977; and June 24, 1977—on which he allegedly made a decision affecting the proposal. It set forth the content of the putative recommendations, advice, or decisions. And, in several instances, it attached letters signed by Conlon which allegedly contained a recommendation, advice, or a decision.

The government's response to the fourth and fifth inquiries was more scanty. In response to the inquiry regarding negotiations, it said:

> The Government alleges that the defendant was negotiating with ABN on December 7, 1976; December 22, 1976; April 21, 1977; May 10, 1977; May 17, 1977; June 21, 1977; and June 24, 1977. We do not know when or with whom such negotiations were begun. The defendant has admitted discussing employment with Edward Wietzen on or about June 10, 1977, and soon thereafter agreed to work for ABN.[10]

Its response to the inquiry regarding arrangements was essentially the same:

> The Government alleges that the defendant had an arrangement for employment with ABN on December 7, 1976; December 26, 1976; April 21, 1977; May 10, 1977; May 17, 1977; June 21, 1977; and June 24, 1977. We do not know where or with whom the arrangement was made

nor do we know when it began, whether it was written or oral, or whether a date for employment had been arranged. The defendant has admitted discussing employment with Edward Weitzen on or about June 10, 1977 and soon thereafter agreed to work for ABN.[11]

After receiving the government's bill of particulars, Conlon renewed his motion to dismiss the conflict of interest count,[12] arguing that the government had not properly alleged the existence of negotiations or arrangements.[13] At oral argument on the motion, the government offered some of the evidence it expected to present at trial to prove the existence of negotiations or arrangements. The essence of this evidence was (1) that in November, 1976, Conlon had met with a real estate broker (and later with an office space planner) regarding office space for ABN, and (2) that, in the course of those meetings, he had stated that he was going to be joining ABN and that the offices were going to be his.[14] The government noted that this issue had been discussed extensively with Conlon before the grand jury.[15] It argued that, therefore, he was on notice as to the substance of the negotiations and arrangements charged. After considering the submissions of the parties, the trial judge granted Conlon's renewed motion to dismiss the conflict of interest count.

In granting the motion, the district court held that a narrow construction of the terms "arrangement" and "negotiating" was necessary to save 18 U.S.C. § 208(a) from being unconstitutionally vague. On this basis, the court construed the statute to require the indictment to allege specific acts of negotiating by the defendant, or

---

10. J.A. at 323.

11. *Id.*

12. J.A. at 339.

13. J.A. at 340–42.

14. Transcript (Tr.) of October 11, 1979, hearing on Motion to Dismiss Count One, at 77–79.

15. *See, e. g.,* J.A. at 46–49, 55, 66, 146–47, and 174–76. Conlon admits that he spoke to the broker and space planner for ABN, and that he occupies the office space now. He says, however, that he did not make the statements concerning prospective employment that the government attributes to him. He claims that he was investigating the office space as a courtesy to ABN, a company that does extensive business with the Bureau of Engraving and Printing.

specific bilateral arrangements or acts of arranging. It then held that the indictment in the instant case failed to meet that standard.[16] This appeal followed.

## II: ANALYSIS

(A) *The Construction of 18 U.S.C. § 208(a)*: The district court felt constrained to read 18 U.S.C. § 208(a) narrowly in order to save it from being unconstitutionally vague. It purported to do so with the following language:

> The Court finds such a narrowing construction is available for section 208(a) by construing "negotiating" to require allegations of specific acts of negotiating by the defendant in concert with the prospective employer; and by construing "arrangement" to require allegations of specific bilateral arrangements or acts of arranging.[17]

■ We find that it is not necessary to require the pleading of "specific acts of negotiating" or "specific bilateral arrangements or acts of arranging" in order to save § 208(a) from vagueness. In the context before us, the terms "negotiating" and "arrangement" are not exotic or abstruse words, requiring detailed etymological study or judicial analysis. They are common words of universal usage.[18] People of ordinary intelligence would have fair notice of the conduct proscribed by the statute.

That there may be marginal cases is not sufficient reason to hold that a statute is too ambiguous to define a criminal offense.[19]

■■ Thus, the narrowing construction imposed by the district court was not constitutionally required. Moreover, a narrow construction does not comport with the legislative history. The words of the statute must be read so as to effectuate the legislative purpose. This will often mean giving the words a broad, rather than a narrow, reading. As the Supreme Court put it over a century ago:

> The object in construing penal, as well as other statutes, is to ascertain the legislative intent. . . . The rule of strict construction is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings, as the wider popular instead of the more narrow technical one; but the words should be taken in such sense, bent neither one way or the other, as will best manifest the legislative intent.[20]

Section 208(a) was enacted in 1962 as part of a general revision of the bribery and conflict of interest laws.[21] That revision was prompted by "a growing concern, both in and out of Congress, with the ever present and perplexing problems of how best to assure high ethical standards in the conduct of the Federal Government."[22]

**16.** *United States of America v. James A. Conlon* (D.D.C. Criminal No. 79–380, October 20, 1970) (hereinafter Memorandum Opinion). J.A. at 367–97.

**17.** Memorandum Opinion at 13. J.A. at 379.

**18.** It is noteworthy that the "narrowing" construction proposed by the district court does not narrow at all the meaning of "negotiating" or "arrangements." It merely requires the pleading of "specific acts" of whatever "negotiating" and "arrangements" are; it adds nothing to the content of the words. This indicates an understanding on the part of the district court of the two words used in the statute—for it uses them itself in its definition.

**19.** *United States v. Petrillo*, 332 U.S. 1, 7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1946). While

we do not pass upon its applicability to situations of the type involved here, we note that the provisions of 18 U.S.C. § 208(b) do provide a mechanism whereby an employee can obtain from his supervisor an exemption from § 208(a) for *de minimus* situations.

**20.** *United States v. Hartwell*, 73 U.S. 385, 395–96, 18 L.Ed. 830 (1867). *See also United States v. Corbett*, 215 U.S. 233, 242, 30 S.Ct. 81, 84, 54 L.Ed. 173 (1909).

**21.** P.L. 87–849, 76 Stat. 1119 (October 23, 1962).

**22.** H.R.Rep. No. 748, 87th Cong., 1st Sess. 2 (1962) (herein House Report). *See also* S.Rep. No. 2213, 87th Cong., 2nd Sess. 4–5 (1962) (herein Senate Report), U.S.Code Cong. & Admin.News 1962, p. 3852.

Section 208 was crafted to "strengthen"[23] its predecessor section by adding, *inter alia,* a proscription against participation by an employee of the executive branch in matters of financial interest to a "prospective employer"[24] or "persons with whom he has business connections."[25] The words "negotiating" and "arrangement," as used in the statute, particularize the kinds of "business connections" encompassed by this provision.[26] In light of the legislative history of the provision, we must conclude that Congress meant the words "negotiating" and "arrangement" in § 208(a) to be given a broad reading, rather than the narrow reading accorded them by the district court.

(B) *The Adequacy of the Indictment in this Case*: An indictment is sufficient if it clearly informs the defendant of the precise offense of which he is accused so that he may prepare his defense.[27] The test for sufficiency is whether it is fair to require the accused to defend himself on the basis of the charge as stated in the indictment.[28] In some cases, it is enough if the indictment puts the charge in the words of the statute—but this is acceptable only where the statute itself fully, directly, and unambiguously sets forth all of the elements of the offense.[29] The more generally applicable rule is that the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged.[30] This latter rule governs the case before us.

The indictment filed by the government in this case is by no means a model indictment. The government was niggardly in making the details of its case known to the defendant.[31] However, the adequacy of the

---

**23.** House Report at 2, 13; Senate Report at 4, 13–14.

**24.** House Report at 13.

**25.** Senate Report at 14, U.S.Code Cong. & Admin.News 1962, p. 3862.

**26.** We note in passing that the Congress that enacted § 208(a) had before it the comprehensive report of the Association of the Bar of the City of New York, *Conflict of Interest and Federal Service*—the report from which the language "any person . . . with whom he is negotiating or has any arrangement concerning prospective employment" was drawn. *See* § 3(b)(4) of the Bar Association's proposed statute. Special Committee on the Federal Conflict of Interest Laws of the Association of the Bar of the City of New York, *Conflict of Interest and Public Service* 280 (1960). That report concluded:

The risk is not bribery through the device of job offers; the risk is that of sapping governmental policy, especially regulatory policy, through the nagging and persistent conflicting interests of the government official who has his eye cocked toward subsequent private employment. To turn the matter around, the greatest public risks arising from post-employment conduct may well occur *during* the period of government employment. . . .

*Id.* at 234 (emphasis in original).

**27.** *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–1047, 8 L.Ed.2d 240 (1962); *United States v. Debrow*, 346 U.S. 374, 377–78, 74 S.Ct. 113, 115–116, 98 L.Ed. 92 (1953).

**28.** *United States v. Caldwell*, 544 F.2d 691, 694 (4th Cir. 1976); *United States v. McGhee*, 488 F.2d 781, 784 (5th Cir. 1974). *See generally*, 1 Wright, Federal Practice and Procedure § 125 (1969).

**29.** *Hamling v. United States*, 418 U.S. 87, 117–19, 94 S.Ct. 2887, 2907–2908, 41 L.Ed.2d 590 (1974); *United States v. Debrow*, 346 U.S. 374, 376–78, 74 S.Ct. 113, 114–115, 98 L.Ed. 92 (1953).

**30.** *Russell v. United States*, 369 U.S. 749, 765, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1961); *Morissette v. United States*, 342 U.S. 246, 270 n. 30, 72 S.Ct. 240, 253, 96 L.Ed. 288 (1951); *Keck v. United States*, 172 U.S. 434, 437, 19 S.Ct. 254, 255, 43 L.Ed. 505 (1898); *Blitz v. United States*, 153 U.S. 308, 315, 14 S.Ct. 924, 927, 38 L.Ed. 725 (1893).

**31.** The author of this opinion, speaking only for himself, notes in the literature a growing awareness of the need for openness by the government in criminal prosecutions. Laying aside entirely the question whether it is constitutionally required, a significant movement toward greater disclosure is taking place. State statutes have required it, trial judges are invoking their discretionary powers to effect it, and a growing number of prosecutors have made it standard practice. *See, e. g.*, Alderstein, *Ethics, Federal Prosecutors, and Federal Courts: Some Recent Problems*, 6 Hofstra L.Rev. 755, 759–73 (1978); Kampfe & Dostal, *Discovery in the Federal Criminal System*, 36 Mont.L.Rev. 189, 205 (1975); *Criminal Procedure—Dis-*

indictment in this case must be assessed on its own merits, quite apart from whether or not it was a model.

█ It is clear that the government *could* have been more specific in the indictment. It provided some additional information in the bill of particulars, and it was even more concrete at oral argument on the renewed motion to dismiss. This casts doubt on the sufficiency of the indictment. And, it is settled that a bill of particulars—and *a fortiori* oral argument—cannot cure a defective indictment. Nonetheless, the sufficiency of the indictment "is not a question of whether it *could* have been more definite and certain." [32] Sufficiency depends upon whether it clearly informs the defendant of the precise offense of which he is accused so that he may prepare his defense.

█ Here, the charge indicated the identity of the company with which Conlon was allegedly involved, and the time frame in which the "negotiating" and "arrangements" existed. It is given that the "negotiating" and "arrangements" concerned prospective employment. The indictment also specified the project of interest to ABN (the signature security system) which was the subject of Conlon's attention. Taken together, this information was enough to give Conlon notice of the offense with which he was charged and to enable him to begin preparing a defense.[33]

covery—*Movement Toward Full Disclosure*, 77 W.Va.L.Rev. 561, 563 (1975); *Symposium, Discovery in Criminal Cases*, 45 F.R.D. 481 (1968); Brennan, *The Criminal Prosecution: Sporting Event or Quest for Truth?* 1963 Wash.L.Q. 279, 285–87; Datz, *Discovery in Criminal Procedure*, 16 U.Fla.L.Rev. 163, 177 (1963); Krantz, *Pretrial Discovery in Criminal Cases: A Necessity for Fair and Impartial Justice*, 42 Neb.L.Rev. 127, 130–33, 154 (1962). A criminal trial is not "a game or a sporting contest," but "a serious inquiry aiming to distinguish between guilt and innocence." Williams, *Advance Notice of the Defense*, 1959 Crim.L.Rev. 548, 554.

32. *United States v. Debrow*, 346 U.S. 374, 378, 74 S.Ct. 113, 115–116, 98 L.Ed. 92 (1953) (emphasis added).

33. The appellee argues that in the bill of particulars the government said that it did not know "when, where or with whom such negotiations

The judgment of the district court is reversed as to Count I and affirmed as to Counts II, III, and IV.

*So ordered.*

were begun," or "where or with whom the arrangement was made." This additional specificity was not necessary to give Conlon the required notice, however.

The district court, for its part, relied on *United States v. Thomas*, 144 U.S.App.D.C. 44, 444 F.2d 919 (1971), and *United States v. Nance*, 174 U.S.App.D.C. 472, 553 F.2d 699 (1976), in support of its conclusion that this indictment was inadequate. This reliance was misplaced. The indictment in *Thomas* was impermissibly vague because it did not allege a fact that was a material element of the offense. The *Nance* indictment lacked any allegation whatsoever on a key element of the offense. There is a difference, of course, between failing to state an element of the offense and being less specific than one could be in spelling out the acts that constitute the offense.